THE STATE OF OHIO, APPELLANT, *v.* DUNCAN, APPELLEE.

[Cite as State v. Duncan (1978), 53 Ohio St. 2d 215.]

216

(No. 77-230—Decided March 15, 1978.)

*Mr. John T. Corrigan*, prosecuting attorney, and *Mr. Michael J. Corrigan*, for appellant.

*Mr. John W. Martin*, for appellee.

CELEBREZZE, J.   Appellant contends that the Court of Appeals erred in holding that certain statements made by the victim to her mother, concerning the sexual conduct of the appellee, were inadmissible because they lacked the essential attributes of spontaneity.

The record discloses that near the hour of 11:00 A. M., on Saturday, March 8, 1975, the victim was at home in her bedroom, watching television, while her infant sister slept in a crib nearby.   The girl's stepfather, appellee herein, was absent from the home when the victim's mother went out to a laundromat.   Shortly thereafter, according to the victim, "Leroy snuck back."   He told her to take off her pants and said "Let's have some sex."   He then proceeeded to stick a pen in her rectum and his finger in her ' 'private.''   The victim also stated that "The Ding-a-ling was out"—an apparent reference to the appellee's reproductive organ.   After threatening the lives of the whole family appellee left the home; the victim then put her clothes back on, turned on the television, and hid in her mother's closet.

During this time Mrs. Duncan had been attempting to gain access to the crowded corner laundromat.   Being unsuccessful, she then returned home.   Hearing that the television set was on upstairs, she called to her daughter, whose only response was "O. K. Everything's O. K."   Mrs. Duncan then went to a building, near her own, which contained a washroom, where she was finally able to load her laundry into several washers.   She made several trips between the washroom and her house, and, at approximately 1:00 P. M., returned to her house with some dry clothes.   Hearing a noise upstairs, she immediately ascended the stairs and checked on the baby, who was asleep.  It was at this time that the victim was observed emerging from Mrs. Duncan's closet.   The victim's body was shaking like "an epileptic seizure" according to the testimony of the mother.

Fearing the child had been into her cosmetics Mrs. Duncan grabbed her, whereupon the victim said, "No, mommy, no. Leroy been picking with me." Upon inquiry the victim described the alleged incident.

Appellant's counsel maintained at trial that although the statement of the victim to her mother was hearsay testimony when repeated by the mother, it should be allowed in evidence because it was part of the *res gestae*. Appellee strenuously objected to its admission, stating that Mrs. Duncan's testimony concerning the child's utterances was clearly hearsay. Appellee contends that too much time had elapsed between the incident and the exclamations for them to be considered spontaneous.

It should be pointed out that at trial, prior to the testimony of Mrs. Duncan, the victim vividly described the alleged incident. There was also testimony from the physician who had examined the victim on the afternoon of March 8, 1975, that she had observed inflammation in the vaginal area. The doctor testified further that when she attempted to examine the pelvic area of the victim the child became so hysterical that it was necessary to administer two sedatives.

In its opinion the appellate court below discussed the case of *Hill* v. *Skinner* (1947), 81 Ohio App. 375. We note that while the court in the *Hill* case did find that testimony relating an injured boy's answer to his mother's questions was inadmissible, because of lack of spontaneity and intervening circumstances, it did not find such testimony to be prejudicial error. Further, the facts in the *Hill* case are easily distinguishable from the instant case. In the *Hill* case the young boy was calm and in the process of being bathed by his mother when certain statements were made. The victim in the instant case was alone, hiding in a closet, when her mother found her and the disputed exclamations occurred. Thus, although the time element is similar in the two cases, the emotional states of the declarants are so widely disparate as to obviate further analysis.

The reviewing court below also cited the case of *Potter*

v. *Baker* (1955), 162 Ohio St. 488, wherein this court set forth certain standards for the admission of spontaneous exclamations under the *res gestae* exception to the hearsay rule. This court, in *Potter*, stated the following at page 500:

"It is elementary that the trial judge is to decide those questions of fact which must be decided in order to determine whether certain evidence is admissible. * * * In the instant case, the trial judge, in determining whether this declaration was admissible, necessarily had to decide certain questions of fact. If his decision on those questions of fact, as reflected in his ruling on the admissibility of this declaration, was a reasonable decision, an appellate court should not disturb it. In other words, we believe that the decision of the trial judge, in determining whether or not a declaration should be admissible under the spontaneous exclamations exception to the hearsay rule, should be sustained where such decision appears to be a reasonable one, even though the reviewing court, if sitting as a trial court, would have made a different decision." Thus, this court has established precedent holding that an appellate court should allow a wide discretion in the trial court to determine whether in fact a declarant was at the time of an offered statement still under the influence of an exciting event.

The length of time elapsed between the commission of the crime and the victim's exclamation appears to be the crux of the decision by the Court of Appeals. Indeed, Professor McCormick has stated that, as a general rule, when an oral utterance is made while the exciting event is still in progress courts have little difficulty in invoking the spontaneous exclamation exception to the hearsay rule, but as the time between the event and the statement increases, so does the reluctance to find the statement an excited utterance. McCormick On Evidence (2 Ed. 1972) 706, Section 297.

Nevertheless, in our opinion each case must be decided on its own circumstances, since it is patently futile to

attempt to formulate an inelastic rule delimiting the time limits within which an oral utterance must be made in order that it be termed a spontaneous exclamation. In this regard we note that Dean Wigmore has made the following observations in relation to the spontaneous exclamation exception to the hearsay rule:

"From the judicial expositions the following limitations, and these only, may legitimately be deduced:

"(a) *Nature of the occasion.* There must be some *occurrence, startling enough* to produce this nervous excitement and render the utterance spontaneous and unreflecting. * * *

"(b) *Time of the Utterance.* The utterance must have been *before there has been time to contrive and misrepresent,* i. e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance. * * *

"It is to be observed that the statements *need not be strictly contemporaneous* with the exciting cause; they may be subsequent to it, provided there has not been time for the exciting influence to lose its sway and to be dissipated. * * *

"* * *

"Furthermore, there can be *no definite and fixed limit* of time. Each case must depend upon its own circumstances * * *.

"* * *

"(c) *Subject of the Utterance.* The utterance must *relate to the circumstances of the occurrence preceding it.* * * * (Emphasis in original.) 6 Wigmore On Evidence (Chadbourn Rev. 1976) 202-203, 222, Section 1750.

In addition, a review of cases from other jurisdictions, in which excited utterances by infant declarants were offered in evidence as part of the *res gestae*, reveals that several courts have expressly indicated that the strict requirements of the *res gestae* rule should be relaxed or liberalized in favor of the admissibility of such utterances. See, *e. g., State* v. *McFall* (1955), 75 S. D. 630, 71 N. W. 2d

299 (six-year-old relates details of molestation two weeks after the fact); *Soto* v. *Territory* (1908), 12 Ariz. 36, 94 P. 1104 (mother of four-year-old victim permitted to testify to details of crime related to her when her son returned home after an hour-and-a-half absence); *Beausoliel* v. *United States* (1939), 71 D. C. App. 111, 107 F. 2d 292 (assault conviction affirmed although mother of six-year-old victim had testified, over objection, to exclamations made by her daughter shortly after an alleged immoral incident in a taxicab). See, generally, Annotation, 83 A. L. R. 2d 1368.

In *State* v. *Lasecki* (1914), 90 Ohio St. 10, a four-year-old boy witnessed a group of men beat his father on the head with a club. When another group of men arrived on the scene a few moments later the young boy, who was in a nervous and frightened condition, was heard to cry out, "The bums killed pa with a broomstick." In reinstating the judgment of conviction this court held that testimony relating the child's exclamation was properly admitted in evidence at trial, commenting as follows at page 27:

"* * * The exclamation of the boy under the circumstances, that it was made in its relation to the transaction, being the sole eyewitness save and except the defendant, speaking under great excitement and impulse, freed from opportunity or occasion to dissemble or fabricate—all these things undoubtedly gave the boy's exclamation great weight with the court and jury. But the primary reason for such great weight was by reason of its causal connection, its logical relation to the facts in the case, and because it was the natural language of the whole situation speaking through the little boy. * * *"

In the instant cause the mother was the first person the victim confided in, at the earliest opportunity she had to do so. One might only speculate as to what went through the child's mind before she was found by her mother. But there is nothing in the record which would indicate that the victim engaged in reflective thought in the interim between the commission of the crime and being found by her

mother, and at no time in the course of these preceedings has it been shown that the little girl would have a motive for fabricating a tale of such perversion. Furthermore, the examining physician's testimony that the victim needed sedation before her legs could be spread for examination, several hours after the incident, would seem to confirm the fact that at the time the exclamations were uttered the child was in a condition of continuing distress and anxiety.

Although we acknowledge the disparate time elements in *Lasecki* and the case at bar, we do not find that difference to be determinative. Rather, we would emphasize an essential similarity between the two cases in that the respective spontaneous exclamations were causally, logically and psychologically related to the criminal acts which each child had witnessesd.

At trial Mrs. Duncan was permitted to impart substantially the same testimony previously elicited from the victim, her daughter. The fact that the mother's repetition of the child's spontaneous exclamations was hearsay cannot be disputed, but under the facts and circumstances of this case we are satisfied that the trial court properly admitted such testimony as a part of the *res gestae* exception to the hearsay rule.

The judgment of the Court of Appeals must be reversed.

*Judgment reversed.*

O'NEILL, C. J., HERBERT, W. BROWN, P. BROWN, SWEENEY and LOCHER, JJ., concur.