### In re MICHAEL.

[Cite as *In re Michael* (1997), 119 Ohio App.3d 112.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 15507 and 15716.

Decided April 11, 1997.

114

*Steven J. Ring,* Montgomery County Assistant Prosecuting Attorney, for appellee.

*Timothy N. Tepe,* for appellant.

WOLFF, Judge.

Bryan E. Michael appeals from a judgment of the Montgomery County Court of Common Pleas, Juvenile Division, finding him delinquent by reason of rape, attempted rape, and gross sexual imposition.

A statement of the evidence presented and of the procedural history follows. The evidence will be discussed in more detail under the assignments of error.

On July 28, 1993, Montgomery County Children Services ("Children Services") removed Christopher Harris and Myra Lovely, brother and sister, from their home and placed them in foster care. The children lived in the foster home of Elva Michael along with Amanda Haynes and Bryan Michael, the natural children of Elva's daughter, Michelle Haynes. While living there, Christopher shared a bedroom with Bryan and Myra shared a bedroom with Amanda. In late October 1993, Christopher and Myra were returned to the care of their mother, Rose Lovely.

Approximately two weeks later, Rose Lovely became aware that the children had allegedly engaged in sexual activity with Bryan while they were in the Michael home. Lovely took both children to Children's Medical Center, where they were examined by doctors and interviewed by social workers. The physical examinations revealed no evidence of sexual abuse.

Lovely then filed a complaint against Bryan with the Germantown Police Department. Detective Dan Ryan interviewed Christopher and Myra on November 17, 1993, regarding their alleged sexual involvement with Bryan. At the time of the alleged incidents, Bryan was fourteen years old, Christopher was eight years old, and Myra was five years old. Detective Ryan also interviewed Lovely, Bryan, doctors from Children's Medical Center, a representative from Children Services, and Dr. Bruce Kline, a clinical psychologist who had been counseling Christopher and Myra since September 1993.

Based on the results of the investigation, Detective Ryan presented his case to the prosecutor's office. On March 25, 1994, Bryan was charged with two counts each of rape, attempted rape, and gross sexual imposition with respect to Christopher and Myra. On August 3, 1994, Detective Ryan again interviewed Christopher and Myra and gave the children an opportunity to recant their stories. Neither child did so.

A trial was held before a referee on October 4, November 14, and December 1, 1994. Prior to trial, the defense moved the court to order Children Services to turn over all records relating to Christopher and to Myra. The court conducted an *in camera* inspection of the records and concluded that the documents were confidential and therefore should not be disclosed. The defense renewed its motion to introduce this evidence during the trial, which the trial court denied.

Before permitting Christopher and Myra to testify, the court questioned them to determine whether they were competent to testify. The court found that Christopher, who was nine years old, was competent to testify, while Myra, who was only six years old, was not competent to testify. Because the state moved to dismiss the charges against Bryan involving Myra at the conclusion of the trial, and the court granted that motion, we will discuss only the evidence presented with respect to the charges involving Christopher.

Dr. Kline testified that he and members of his staff counseled Christopher between September and December 1993. In total, they saw Christopher between eight and ten times, for forty-five minutes to an hour each time. Christopher was counseled both individually and with Myra. The counseling consisted of various interviews, a psychological evaluation, and doll play therapy using anatomically correct dolls.

According to Dr. Kline, three criteria are used to determine if a child has been sexually abused: (1) whether the child is subdued, (2) whether the child has "anger with the perpetrator," and (3) the degree to which the child is conversant in sexual matters in comparison to "ordinary" children. Dr. Kline testified that Christopher was not subdued but was "aggressive," "frustrated," "very angry," and "very conversant" in sexual matters. Dr. Kline diagnosed Christopher as having engaged in oral sex and having had anal sex performed on him a number of times and opined that Christopher had been sexually abused. Dr. Kline did not indicate, however, that Bryan was Christopher's abuser.

Christopher testified that while he lived in the Michael home, Bryan "stuck his thing in his butt" and that it "sometimes hurt a lot." Bryan also made Christopher "suck his dick." These incidents of sexual abuse took place "in the bedroom, outside and hallway." On cross-examination, the defense elicited graphic details from Christopher regarding the sexual abuse.

Several witnesses testified in Bryan's defense, including Debra Weidel, Bryan's tutor, Michelle Haynes, Bryan's natural mother, and Diane Hyde, a friend of Michelle Haynes. The sum of their testimony was that Bryan was concerned about Christopher's well-being, was a likeable and cooperative student, and had a reputation for truthfulness at school. Michelle Haynes and Diane Hyde testified that Christopher idolized Bryan. None of the witnesses had observed anything unusual about the relationship between Bryan and Christopher that would indicate that there was sexual activity between them.

Elva Michael, Bryan's grandmother and Christopher's foster mother, testified that she had established certain guidelines in the home while Christopher and Myra lived there. For instance, the doors to the bedrooms were to stay open at all times, and the children had a routine bath and bedtime. According to Elva, the children were supervised at all times.

Bryan testified that he and Christopher got along well and sometimes played together, either riding bikes or playing soccer or Legos. Bryan denied any sexual involvement with Christopher. He specifically denied touching Christopher's penis, having Christopher touch his penis, or putting his penis in Christopher's mouth or anus.

At the conclusion of the trial, the referee found Bryan responsible for the charges of rape, attempted rape, and gross sexual imposition involving Christopher. Thereafter, on December 30, 1994, the referee filed a report and recommendation articulating her findings of fact and conclusions of law. Bryan filed objections to the referee's report, which the trial court overruled. A dispositional hearing was held on December 28, 1995. Bryan was committed to the legal custody of the Department of Youth Services for a minimum period of twelve months and a maximum period not to exceed his twenty-first birthday. His commitment was suspended on the condition of future good behavior, and he was placed on official probation until March 28, 1996.

Bryan asserts five assignments of error on appeal.

"I. The trial court erred to the substantial prejudice of the appellant in the application of the rape-shield law to appellant in violation of Article I. Section 10 of the Ohio Constitution, [and] the Sixth and Fourteenth Amendments to the Constitution to the United States."

Bryan contends that the trial court violated his constitutional right to present evidence as grounded in the Confrontation and Compulsory Process Clauses of Section 10, Article I of the Ohio Constitution and the Sixth Amendment to the United States Constitution when it applied the rape shield law to exclude evidence essential to his defense. Specifically, Bryan argues that the trial court should have permitted evidence, in the form of witness testimony and Children Services records, that (1) Christopher had been sexually abused prior to his placement in the Michael home; (2) one of Lovely's friends had been convicted of sexually abusing Christopher in the identical manner Christopher had accused Bryan of sexually abusing him; (3) Christopher had a history of bizarre sexual behavior and of acting inappropriately with Myra; and (4) the Lovely family had continuous problems with Children Services that had twice resulted in the removal of Christopher and Myra from the Lovely home.

The rape shield law prohibits any evidence of a victim's sexual history "unless it involves evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender." Even if one of the foregoing exceptions applies, introduction of such evidence is permitted only if the court finds that the evidence is material to a fact at issue and that its prejudicial nature does not outweigh its probative value. R.C. 2907.02(D). Application of the rape shield law may not, however, unduly infringe upon a defendant's constitutional rights. Thus, there may be circumstances in which a defendant's confrontation right requires that evidence of a complainant's prior sexual conduct be admitted, notwithstanding the fact that the evidence would otherwise be excluded by the rape shield law. See *State v. Williams* (1986), 21 Ohio St.3d 33, 21 OBR 320, 487

N.E.2d 560; *State v. Pulley* (Jan. 27, 1993), Lorain App. No. 92CA005418, unreported, 1993 WL 20989.

■ Bryan does not contend that the contested evidence was admissible under the rape shield law. Rather, he claims that application of the statute in this case unconstitutionally infringed on his ability to present a defense. To determine whether the statute was unconstitutionally applied, we must balance the state interests advanced by the rape shield law against the probative value of the excluded evidence. *State v. Gardner* (1979), 59 Ohio St.2d 14, 17, 13 O.O.3d 8, 9–10, 391 N.E.2d 337, 340–341. The rape shield law serves the legitimate state interests of (1) guarding the complainant's sexual privacy and protecting the complainant from undue harassment, (2) discouraging the tendency to try the complainant rather than the accused, (3) aiding crime prevention by encouraging the reporting of rape, and (4) aiding the truth-finding process by excluding evidence which is unduly prejudicial and only marginally probative. *Id.* at 17–18, 13 O.O.3d at 9–10, 391 N.E.2d at 340–341.

In assessing the probative value of the excluded evidence, the key is its relevancy as proof of the matters for which it is offered. *Id.* at 18, 13 O.O.3d at 10, 391 N.E.2d at 341. Cases decided since *Gardner, supra,* have established that in order for the contested evidence to be admissible, it must be submitted for a more important purpose than mere impeachment of a witness's credibility. *Williams, supra; State v. Ferguson* (1983), 5 Ohio St.3d 160, 5 OBR 380, 450 N.E.2d 265; *State v. Guthrie* (1993), 86 Ohio App.3d 465, 621 N.E.2d 551.

■ It is within the sound discretion of the trial court to determine the relevance of evidence and to apply the rape shield law to best meet the purposes behind the statute. *State v. Leslie* (1984), 14 Ohio App.3d 343, 346, 14 OBR 410, 413–414, 471 N.E.2d 503, 507. A defendant has no Sixth Amendment right to confront a witness with irrelevant evidence. *Id.,* citing *Logan v. Marshall* (N.D.Ohio 1981), 540 F.Supp. 3.

Bryan argues that the trial court abused its discretion when it excluded evidence of Christopher's sexual history because it prevented Bryan from showing an alternative source of Christopher's knowledge of sexual conduct or activity. As we discussed above, one of the three criteria Dr. Kline evaluated in order to determine if Christopher had been sexually abused was the degree to which Christopher was conversant in sexual matters as compared to other children his age. Dr. Kline testified that Christopher was "very conversant" in sexual matters. Bryan asserts that evidence that Christopher had been sexually abused by someone other than himself was relevant to show that Christopher's knowledge of sexual matters was not the result of his having been sexually abused by Bryan.

We have not previously addressed the issue of whether evidence barred by the rape shield law should be admissible in furtherance of a defendant's constitutional rights for the limited purpose of establishing an alternative explanation for a child victim's sexual knowledge. The Twelfth District Court of Appeals has addressed this issue in *Guthrie,* 86 Ohio App.3d 465, 621 N.E.2d 551, a case upon which the state relies in support of its argument that evidence of Christopher's sexual history should not be admissible.

In *Guthrie,* the defendant was charged with rape, gross sexual imposition, and felonious sexual penetration with respect to incidents involving three juvenile victims. Although the defendant had admitted several of the children's allegations, he sought to introduce evidence at trial that the victims had previously been sexually abused by someone other than himself to establish an alternative explanation for their sexual knowledge. The trial court refused to allow the evidence on the basis of the rape shield law. On appeal, the defendant argued that the trial court's refusal to admit such evidence denied him the right to confront the witnesses against him. The appellate court stated that the contested evidence was not material to a fact at issue and that, therefore, the trial court had not abused its discretion in excluding the evidence under the rape shield law. *Id.* at 468, 621 N.E.2d at 553–554.

Bryan argues that the probative value of the excluded evidence in this case is much greater than that in *Guthrie* because the evidence would not merely show prior *general* sexual activity between Christopher and another, it would show that Christopher had previously been sexually abused in a manner *identical* to that in which he claims to have been abused by Bryan. Bryan also points to cases from other jurisdictions which have found it violative of a defendant's confrontation right to apply the rape shield law to preclude the defendant from showing a child victim's alternative source of sexual knowledge. See *State v. Pulizzano* (1990), 155 Wis.2d 633, 456 N.W.2d 325; *Summitt v. State* (1985), 101 Nev. 159, 697 P.2d 1374.

In both *Pulizzano* and *Summitt,* the defendants sought to introduce evidence at trial of prior sexual experiences of the child victims to show that the victims had independent knowledge of sexual acts. The trial courts excluded the evidence under each state's rape shield law. The supreme courts, however, concluded that the defendants' right to present the evidence was paramount to the state's interest in excluding the evidence. The reasoning behind this conclusion was succinctly stated by the *Pulizzano* court:

"The inference that [the child victim] could not possess the sexual knowledge he does unless [the defendant] sexually assaulted the children greatly bolsters [the child victim's] allegations. In order to rebut that inference, [the defendant] must establish an alternative source for [the child victim's] sexual knowledge.

Evidence of the prior sexual assault is therefore a necessary and critical element of [the defendant's] defense." *Id.*, 155 Wis.2d at 653–655, 456 N.W.2d at 334–335.

The defendants in *Pulizzano* and *Summitt* both denied having committed the offenses with which they were charged, and the state did not present any physical evidence of the alleged abuse.

■ The unfortunate situation with which we are confronted is similar to that confronting the *Pulizzano* and *Summitt* courts. We have a child who had previously been abused and who has allegedly been abused again. The defense wished to use this prior sexual abuse to show that Christopher already had sexual knowledge beyond his years, thus permitting the conclusion that such sexual knowledge was not attributable to Bryan. Although evidence of Christopher's prior sexual abuse would intrude on an intimate detail of his personal life, such intrusion was not to harass, degrade, or embarrass him, or to generally attack his credibility by implying that he was immoral or unchaste. Obviously, this is not a rape case where evidence of the victim's prior, consensual sexual encounters is sought to be introduced to imply consent. Further, this case is factually distinguishable from *Guthrie* in at least one important respect. In *Guthrie*, the defendant had admitted several of the offenses with which he was charged. Here, similar to the defendants in *Pulizzano* and *Summitt*, Bryan categorically denied sexually abusing Christopher, and there was no physical evidence that Bryan did sexually abuse Christopher.

■ We agree with the *Summitt* court that the average factfinder would consider a child of Christopher's age to be a sexual innocent. Therefore, the factfinder would believe the sexual experience he described must have occurred in connection with the incident being prosecuted; otherwise, he could not have described it. *Summitt*, 101 Nev. at 163–164, 697 P.2d at 1377, citing *State v. Howard* (1981), 121 N.H. 53, 60–62, 426 A.2d 457, 462. Here, evidence that Christopher had been sexually abused in the past was essential to Bryan's defense, particularly where, as here, Christopher had been sexually abused in the identical manner which he claims to have been abused by Bryan.

Undoubtedly, evidence that Christopher had previously been sexually abused would impeach his credibility. Introduction of such evidence, however, would also serve the more important purpose of affording Bryan the opportunity to establish an alternative explanation for Christopher's sexual knowledge. While the decision whether to admit evidence of a victim's sexual history is committed to the sound discretion of the trial court, if the trial court in this case had excluded all evidence of Christopher's prior sexual abuse, such ruling would have been unreasonable.

As the state correctly points out, however, the defense elicited testimony about Christopher's prior sexual abuse during its cross examination of Dr. Kline and its direct examination of Naomi Ewald–Orme, the Lovelys' Children Services caseworker, as follows.

"Q: [By Mr. Tepe] Doctor, thank you. My question to you, the last question to you was whether or not you knew that Chris Harris had in fact been sexually abused in the past?

"A: Yes, I did.

"Q: You did know that?

"A: Yes.

"Q: Is it fair to say that knowing that would contribute to the anger that— what Christopher was observing?

"A: Well, I can say this, that he was very definitive in separating the incidents of his prior abuse to the incident that occurred later and he was specific in his anger about each of those in separate ways. * * *

"Q: Okay, and are you aware that the acts which Christopher alleges against Bryan are identical to those that he alleged against [the] previous perpetrator?

"A: Yes, I am.

" * * * *

"Q: Ms. Ewald, were you aware that Christopher had been sexually abused in the past?

"A: Yes.

" * * * *

"Q: Were you concerned as a member—a caseworker in this case and a member of Montgomery County Children Services, concerned about sexual behavior that was occurring between Christopher and Myra?

"A: Yes.

" * * * *

"Q: Were any of these things [indications of sexual abuse] present in Chris and Myra prior to them—their placement in the home of Elva Michael?

"A: Correct, that there were.

"Q: Okay, did you notice any—and did any of these behaviors worsen while they were in the home of Elva Michael?

"A: No."

The testimony of Dr. Kline and Ewald–Orme not only established that Christopher had been sexually abused in the past, it also established that he had been abused in the same way he was accusing Bryan of abusing him. This evidence was sufficient to establish an alternative explanation for Christopher's sexual knowledge, thus permitting the conclusion that Christopher's sexual knowledge was not attributable to Bryan. Additionally, Ewald–Orme's testimony that Christopher's behavior prior to his placement in foster care indicated that he had been sexually abused and that this behavior did not worsen while he was in foster care buttressed the defense's position that Christopher's sexual knowledge had not been gained from anything that happened to him while he lived in the Michael home. Because there was evidence in the record that established an alternative explanation for Christopher's sexual knowledge, application of the rape shield statute did not unconstitutionally infringe upon Bryan's right to present evidence in his defense.

 Next, Bryan contends that the trial court abused its discretion when it excluded evidence of Christopher's sexual history because it deprived Bryan of the right to test the accuracy and truthfulness of Christopher's testimony. Essentially, Bryan appears to argue that he should have been permitted to cross-examine Christopher regarding the prior sexual abuse. We fail to see how admission of the prior sexual abuse to test the accuracy and truthfulness of Christopher's testimony is for a more important purpose than mere impeachment of Christopher's credibility. As such, evidence of Christopher's prior sexual abuse was not admissible for that purpose. *Gardner*, 59 Ohio St.2d 14, 13 O.O.3d 8, 391 N.E.2d 337; *Ferguson*, 5 Ohio St.3d 160, 5 OBR 380, 450 N.E.2d 265. Moreover, permitting the defense to cross-examine Christopher regarding the prior sexual abuse could frustrate the goals behind the rape shield statute by exposing Christopher to undue harassment. This consideration is particularly important in cases involving child victims because cross-examination has been recognized as one of the most potentially damaging aspects of a child's participation in a trial. *Pulizzano, supra,* 155 Wis.2d at 646–648, 456 N.W.2d at 331. Therefore, the trial court did not abuse its discretion in not allowing the defense to cross-examine Christopher regarding the prior sexual abuse.

Relying on *Williams*, 21 Ohio St.3d 33, 21 OBR 320, 487 N.E.2d 560, Bryan argues that the trial court abused its discretion when it excluded evidence of Christopher's sexual history because it precluded the defense from negating the implied establishment of an element of the offense.

*Williams* involved a rape prosecution in which the defendant admitted to having had sex with the alleged victim, Tracy Washington, but claimed that the sex had been consensual. On direct examination, Washington testified that she did not have sex with men because she was gay. Later in the trial, defense

witness John Fleming, Jr., attempted to testify on direct examination regarding his prior sexual relations with Washington. The state objected, and the testimony was stricken from the record. The defense then proffered Fleming's testimony, as well as the pretrial testimony of James Hart, who had testified as to Washington's reputation in the community as a prostitute.

On appeal, the Supreme Court concluded that the probative value of Fleming's and Hart's testimony outweighed any interest the state had under the rape shield law in its exclusion. 21 Ohio St.3d at 36, 21 OBR at 322–323, 487 N.E.2d at 562–563. Washington had, in effect, testified that she never consented to sex with men. The testimony proffered by the defense directly refuted this contention. The court reasoned that because the contested issue in the case was consent, which directly relates to an element of the crime of rape, the proffered testimony was being submitted for more than mere impeachment of Washington's credibility. Indeed, the evidence was being offered to negate the implied establishment, through Washington's testimony, of an element of the crime charged, *i.e.,* force. *Id.*

Bryan argues that here, as in *Williams,* the state used the testimony of one of its witnesses to imply an element of the crime charged. Specifically, Bryan asserts that Dr. Kline's testimony was offered to imply the "act element" of the crimes, *i.e.,* that Bryan had engaged in sexual conduct with Christopher. Bryan concedes that Dr. Kline did not testify that Bryan was Christopher's abuser, but argues that just for that reason, the state must have introduced Dr. Kline's testimony solely to imply that Bryan had engaged in sexual conduct with Christopher.

█ We fail to see how Dr. Kline's testimony that Christopher had been sexually abused impliedly established that *Bryan* had sexually abused Christopher. In fact, we see no similarity between this case and *Williams.* Thus, although evidence of Christopher's prior sexual abuse was presented at trial, even if it had not been, the trial court would not have abused its discretion in excluding it. In other words, *Williams* did not compel its admission.

Finally, Bryan contends that the trial court abused its discretion when it excluded evidence of Christopher's sexual history because it precluded him from showing evidence of Rose Lovely's motive to fabricate the evidence against him. Bryan asserts that Lovely had a motive to fabricate because, prior to allegations having been made against Bryan, allegations had been made against her which implicated her in wrongdoing. Therefore, she wanted to direct suspicion away from herself and her paramour.

█ Bryan claims that the following evidence demonstrates that Lovely had a motive to fabricate. In September 1993, Bryan told Debra Weidel, his tutor, that

he was concerned about Christopher being placed back in Rose Lovely's care because Christopher had sexual knowledge beyond that which an eight-year-old should have and may have been sexually abused by Lovely or someone else in the Lovely home. Weidel spoke to Christopher's teacher, who then reported Bryan's allegations to John Vincent, the attendance officer for the Germantown Valleyview School District. Vincent confirmed that he had received a report of alleged abuse involving Christopher as the victim, but not involving Bryan as the perpetrator. Vincent testified that he had reported the allegation to Ewald–Orme.

Strikingly lacking from the foregoing is any evidence that Rose Lovely *knew* that Bryan had made these allegations against her. Without knowledge of the allegations, Lovely would have had no motive to fabricate evidence against Bryan to divert suspicion away from herself or her paramour. In addition to there being no evidence in the record that Lovely knew of Bryan's allegation, there is also no evidence that Lovely even knew who Bryan was before she learned that Christopher and Myra had allegedly engaged in sexual conduct with him. Because there is no evidence that Lovely knew of Bryan's allegations, the trial court properly excluded evidence of Christopher's sexual history to show that Lovely had a motive to fabricate evidence against Bryan.

Bryan has not shown that application of the rape shield statute unconstitutionally deprived him of the right to confront witnesses or to present a defense. Accordingly, the first assignment of error is overruled.

"II. The trial court erred to the substantial prejudice of the appellant by denying the admissibility of evidence used for the purpose of showing motive of a key prosecution witness."

Bryan contends that the trial court erred when it excluded evidence he sought to introduce to show motive of a key prosecution witness, Rose Lovely, to fabricate her testimony. Specifically, Bryan argues that the trial court should have permitted Ewald–Orme, the Lovelys' Children Services caseworker, to testify that Rose Lovely had threatened Ewald–Orme's life and attempted to inflict bodily injury on her by pushing her down a flight of stairs. Through Ewald–Orme's testimony, Bryan claims that he could have established that Lovely had a motive to fabricate her testimony because she resented Children Services, as shown by her behavior towards Ewald–Orme, and wanted it to appear as if Children Services had erred in their placement of Christopher and Myra in the Michael home. In turn, Bryan contends that, if he had been permitted to show that Lovely had a motive to fabricate, "it would have raised more doubt [regarding] whether she had influenced Chris to fabricate his testimony out of his love for her." Bryan asserts that because showing this

motive was a key element of his defense, the trial court erred to his prejudice in not permitting Ewald–Orme's testimony.

During cross-examination, Lovely denied that she had threatened or tried to physically harm Ewald–Orme. Bryan called Ewald–Orme to testify on behalf of the defense and asked her if Lovely had ever threatened or attempted to physically injure her. The state objected to these questions on the basis that, pursuant to Evid.R. 608(B), extrinsic evidence of Lovely's conduct was inadmissible to attack her credibility. The court sustained the state's objection.

■ Evid.R. 608(B) states that "specific instances of conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness * * * may not be proved by extrinsic evidence." Here, Bryan sought to introduce extrinsic evidence, through Ewald–Orme's testimony, that Lovely had threatened and attempted to physically injure Ewald–Orme. Under Evid.R. 608(B), these alleged acts may not be proved by extrinsic evidence after Lovely denies the conduct on cross-examination. "[I]f the answers received on cross-examination do not satisfy the examiner, it is said that the examiner is bound by or 'stuck' with the responses." *State v. Leuin* (1984), 11 Ohio St.3d 172, 174, 11 OBR 486, 488–489, 464 N.E.2d 552, 554–555; accord *State v. Boggs* (1992), 63 Ohio St.3d 418, 588 N.E.2d 813; *State v. Williams* (1988), 38 Ohio St.3d 346, 528 N.E.2d 910. Therefore, the trial court properly excluded the testimony under Evid.R. 608(B).

Bryan argues, however, that even if Ewald–Orme's testimony concerning Lovely's conduct is not admissible under Evid.R. 608(B), her testimony may be admissible under Evid.R. 404(B), which provides:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

Bryan does not cite any Ohio authority in support of this argument but relies on *United States v. Smith Grading & Paving, Inc.* (C.A.4, 1985), 760 F.2d 527.

In *Smith,* four individuals, including Theodore Dellinger, were tried for rigging a bid on a sewer construction project. On cross-examination, the prosecution asked Dellinger if he had previously rigged a project in Kensington, South Carolina. Dellinger denied the allegation. The court then allowed the prosecution to present a rebuttal witness who testified that Dellinger had participated in the Kensington bid-rigging scheme. The Fourth Circuit Court of Appeals acknowledged that the testimony at issue fell within the scope of both Fed. R.Evid. 608(b) and 404(b). The court observed that evidence of Dellinger's prior

bid rigging was relevant to his intent and knowledge of the charged conspiracy, and that the evidence was more probative than prejudicial because of the close relationship between the prior illegal activity and the charged offense. The court concluded that in cases where the evidence was probative of a material issue in the case, Fed.R.Evid. 404(b) took priority over Fed.R.Evid. 608(b). *Id.* at 531.

The Sixth Circuit Court of Appeals followed *Smith* in *United States v. Horton* (C.A.6, 1988), 847 F.2d 313, and *Boutros v. Canton Regional Transit Auth.* (C.A.6, 1993), 997 F.2d 198. *Boutros* involved an employment discrimination case in which David Boutros alleged national origin harassment, wrongful discriminatory discharge, and deprivation of procedural due process rights. The Canton Regional Transit Authority ("CRTA") claimed that Boutros had been discharged for, among other things, acting inappropriately towards female passengers. Boutros denied the alleged misconduct. Shrirene Straka, a female passenger on Boutros's bus route and defense witness, was then permitted to testify that Boutros had behaved inappropriately towards her and that she had filed a complaint with CRTA against him. The court found that as Boutros had made a claim of wrongful termination and Straka's testimony had direct bearing on the alleged misconduct which the defense claim led to his discharge, Straka's testimony was directly related to material issues: whether the incidents occurred and whether the termination was wrongful. As the testimony was not received solely for impeachment purposes, it was admissible notwithstanding Fed.R.Evid. 608(b). *Id.* at 204–205.

Although *Smith* and *Boutros* are not binding on this court, the wording of the federal and state Evidence Rules involved here is identical. Therefore, we may look to the circuit courts' application of these rules for guidance. *Smith* and *Boutros* establish that in order for evidence which is inadmissible pursuant to Evid.R. 608(b) to be admissible pursuant to Evid.R. 404(b), the evidence must be probative of a material issue in the case; the evidence may not be admitted solely for impeachment purposes. Here, Bryan argues that evidence that Rose Lovely threatened and attempted to physically harm Ewald–Orme should be admissible pursuant to Evid.R. 404(B) because it shows Lovely's "motive to fabricate her testimony." We agree with the state, however, that Bryan fails to explain how evidence of Lovely's motive to fabricate is relevant to anything other than Lovely's credibility, or how Lovely's conduct is probative of the material issue in this case: whether Bryan engaged in sexual conduct or sexual contact with Christopher.

Although there might be situations, such as those presented in *Smith* and *Boutros*, in which evidence that is excluded by Evid.R. 608(B) should nevertheless be admitted under Evid.R. 404(B), we are not presented with such a situation here. The second assignment of error is overruled.

"III. The trial court erred to the substantial prejudice of the defendant by admitting Rose Lovely's hearsay statements made by Myra under the Evid. Rule 803 excited utterance exception even though the statements were elicited for about 25 minutes in several locations with leading questioning in a manner in which the responses could not be said to be spontaneous."

Bryan contends that the trial court erred when it permitted Lovely to testify as to statements made to her by Myra. Specifically, Bryan argues that the trial court improperly admitted, under the "excited utterance" exception to the hearsay rule, certain hearsay statements which were made by Myra to Lovely.

Evid.R. 803, which establishes those categories of hearsay that are not excluded by the hearsay rule, states:

"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

* * *

"(2) Excited utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

In *Potter v. Baker* (1955), 162 Ohio St. 488, 55 O.O. 389, 124 N.E.2d 140, the Supreme Court of Ohio announced a four-part test to determine the admissibility of a "spontaneous exclamation," which is the common-law exception to the hearsay rule now codified in Evid.R. 803(2) and termed an "excited utterance." *State v. Taylor* (1993), 66 Ohio St.3d 295, 300, 612 N.E.2d 316, 320, fn. 1.

"Such testimony as to a statement or a declaration *may be* admissible under an exception to the hearsay rule for spontaneous exclamations where the trial judge reasonably finds (a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement or declaration spontaneous and unreflective, (b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties, so that such domination *continued* to remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, (c) that the statement or declaration related to such startling occurrence or the circumstances of such startling occurrence, and (d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration." (Emphasis *sic.*) *Potter, supra,* at paragraph two of the syllabus.

The Supreme Court has consistently followed the *Potter* criteria since the adoption of the Rules of Evidence. *Taylor, supra,* 66 Ohio St.3d at 301, 612 N.E.2d at 321, fn. 2.

The statements admitted by the trial court as excited utterances were statements made by Myra to her mother approximately two weeks after Myra had been returned to Rose Lovely's care. Lovely, her friend Gail Haston, Christopher, and Myra were watching a soap opera at Haston's home. Lovely testified that when the actors on the soap opera started kissing, Myra became very upset and started crying. Lovely's testimony continued as follows:

"Q: [By Mr. Cox] What exactly did she [Myra] say to you [Lovely]?

"A: She said that Bryan had done this to her and she was pointing at the TV. When I first asked her who Bryan was, because I didn't realize who he was at the time, she said in the foster home, and, you know, then she said— I said, you mean he just kissed you, you know, hug or whatever, you know, this is what I'm thinking, she said no, he kissed me here, and then she pointed at her neck, and then she said, and it was nasty because he kissed me down here, and she was talking about her vagina.

" * * *

"Q: And did she say anything else in regard to this?

"A: Just that he had hurt her and she said that she— that he had— do you want me to tell about the intercourse?

"Q: Tell exactly what she told you, that's what I'm asking you.

"A: She said that he would take— let's see, he took his pants down, he would make her take her pants down. He tried to get her in the front, but he couldn't so he bent her over and he was getting it into her back and then he would make her suck on his penis. She said there was white gunky stuff and she said there was blood. She said that it hurt, that he covered her mouth up with his hands, she couldn't scream. If she did scream he would kill her."

Lovely testified that Myra told her the foregoing over the course of approximately twenty-five minutes.

Bryan contends that the first two requirements of the *Potter* four-part test have not been met in this case and that the state failed to establish that Myra had sufficient intelligence to render the statements she made to Lovely reliable.

▮ Bryan argues that Myra's statements were not the result of nervous excitement because there was a "substantial delay" of two weeks between the alleged abuse and her statements. Initially, we note that there is no *per se* length of time following the occurrence after which a statement can no longer be

considered an excited utterance. Although the passage of time between the event and statement is relevant, it is not dispositive. Each case must be decided on its own facts and circumstances. *Taylor, supra,* 66 Ohio St.3d at 303, 612 N.E.2d at 322; *State v. Duncan* (1978), 53 Ohio St.2d 215, 219, 7 O.O.3d 380, 382–383, 373 N.E.2d 1234, 1236–1237. Moreover, there has been a trend of liberalizing the requirements for an excited utterance in cases of statements made by children who say they were sexually assaulted, because children have limited reflective powers and are likely to remain in a state of nervous excitement longer than would an adult. *Taylor,* 66 Ohio St.3d at 304, 612 N.E.2d at 323, citing *State v. Boston* (1989), 46 Ohio St.3d 108, 545 N.E.2d 1220; see, also, *State v. Wallace* (1988), 37 Ohio St.3d 87, 524 N.E.2d 466; *State v. Wagner* (1986), 30 Ohio App.3d 261, 30 OBR 458, 508 N.E.2d 164.

While we have not addressed the applicability of the excited utterance exception where two weeks have passed between the incident and the statement, the Eighth District Court of Appeals has in *State v. Sanders* (June 21, 1990), Cuyahoga App. No. 56977, unreported, 1990 WL 84318. In *Sanders,* a four-year-old victim was taken to a social worker two weeks after the alleged sexual abuse had occurred. The victim told the social worker that the defendant had touched her vagina and "rear end." The victim's statements to the social worker were admitted at trial as excited utterances. On appeal, the court reasoned that because of the victim's young age, she lacked both the motive and necessary reflective capabilities to fabricate her story during the two weeks between the incident and her statements to the social worker. Therefore, the court found that the statements were properly admitted as excited utterances.

Other courts have found statements admissible as excited utterances where even longer periods of time have elapsed between the incident and the statements. See *State v. List* (May 1, 1996), Summit App. No. 17295, unreported, 1996 WL 221899 (thirteen-year-old victim's statements to a friend seven months after the alleged sexual abuse had occurred were admissible as excited utterances where statements were made after the victim and friend had been involved in an argument and the victim was crying and upset); *State v. Stipek* (Mar. 30, 1995), Belmont App. No. 92–B–59, unreported (sixteen-year-old victim's statements to her boyfriend four to six weeks after the alleged sexual abuse had occurred were admissible as excited utterances where victim was highly emotional and not in control at the time the statements were made).

Here, five-year-old Myra started crying and became very upset while watching a soap opera in which the actors were kissing. She pointed to the television and stated that Bryan had done the same things to her. There is no evidence in the record that Myra discussed the alleged sexual abuse with anyone else before she made these statements to Lovely.

We must give a great deal of deference to the trial court's determination of whether a declarant is still under the influence of an exciting event when the statements are made. *Duncan,* 53 Ohio St.2d at 219–220, 7 O.O.3d at 382–384, 373 N.E.2d at 1236–1237. Under the circumstances here, the trial court reasonably concluded that Myra's statements were made under the stress of nervous excitement. Myra's young age, like the child victim in *Sanders,* and her emotional state at the time she made the statements, like the victims in *List* and *Stipek,* lent the necessary indicia of trustworthiness and spontaneity to her statements. Therefore, the trial court did not abuse its discretion in admitting the statements as excited utterances even though two weeks had passed between the alleged sexual abuse and the statements.

Brian makes a related argument that the statements were not excited utterances because Myra was given "ample time and opportunity to reflect" during the twenty-five minutes she was making these statements. As we have concluded that the trial court reasonably found that Myra was still under the stress and excitement of the event two weeks after it had occurred, we also conclude that it was reasonable for the court to find that Myra's reflective faculties continued to be dominated by this nervous excitement during the twenty-five minutes during which she was making the statements.

Next, relying on *State v. Terra* (1991), 74 Ohio App.3d 189, 598 N.E.2d 753, Bryan argues that Lovely's questioning of Myra was so leading that Myra's responses were not spontaneous and unreflective, and thus not admissible as excited utterances. In *Terra,* the mother discovered the defendant kneeling on the victim's bed with his pants unzipped and his belt buckle unfastened. The victim, who was nine years old at the time, suffered from brain damage and cerebral palsy and had serious mental and physical disabilities. The victim's diaper was open on one side, and her genitals were partially exposed. After the defendant left the room, the mother asked the victim, "Did Art [defendant] hurt you?" "Are you okay?" and "Do you want Art to leave?" The court found that the questions were not only leading, but that they were not phrased so as to receive spontaneous responses that would indicate what actually had occurred and whether a crime had been committed.

Here, neither the state nor the defense elicited testimony from Lovely regarding the specific questions she asked Myra. However, unlike the situation presented in *Terra,* where the mother practically caught the defendant "in the act," there is no evidence in the record that Lovely knew or had an opinion regarding what had happened to Myra before Myra told her. Thus, the record does not demonstrate, either directly or inferentially, that Lovely asked Myra leading questions regarding the alleged sexual abuse that destroyed the spontaneity or unreflectiveness of Myra's responses.

Again relying on *Terra, supra,* Bryan argues that the state failed to establish that Myra had sufficient intelligence to render the statements she made to Lovely reliable. In *Terra,* the victim's mother testified that the victim had an IQ of a two-year-old. Given this, the court was concerned that the reliability of the victim's statements was "highly speculative" even under an excited utterance standard. *Id.,* 74 Ohio App.3d at 197, 598 N.E.2d at 758. The court observed that no case had been cited where a two-year-old's statement had been admitted as an excited utterance. Accordingly, the court held that, in order for an excited utterance of a child of tender years to be admissible, the evidence must indicate that the child possessed sufficient intelligence to render his statement reliable, notwithstanding his incompetency to testify at trial. *Id.* at 199, 598 N.E.2d at 759–760.

Here, Myra was five years old at the time she made the statements to Lovely. Bryan does not direct us to any evidence that would cast doubt upon Myra's intelligence. During the court's questioning of Myra to determine whether she was competent to testify, Myra recited the alphabet, counted to twenty-one before being stopped, stated her age and what grade she was in, and named the colors in the dress she was wearing. Additionally, about two years before the *Terra* decision, the Supreme Court had, in fact, upheld the introduction into evidence of statements made by a two-and-a-half-year-old victim under the excited utterance exception to the hearsay rule. See *Boston,* 46 Ohio St.3d 108, 545 N.E.2d 1220.

The decision of the trial court to admit the statements Myra made to Lovely as excited utterances was reasonable. Accordingly, the third assignment of error is overruled.

"IV. The trial court erred to the substantial prejudice of defendant-appellant by failing to find reasonable doubt of guilt as against the manifest weight of the evidence."

Bryan contends that the trial court's finding that he was delinquent by reason of rape, attempted rape, and gross sexual imposition was against the manifest weight of the evidence.

In determining whether the trial court's finding of delinquency was against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the factfinder clearly lost its way and created a manifest miscarriage of justice. *State v. Hufnagel* (Sept. 6, 1996), Montgomery App. No. 15563, unreported, 1996 WL 501470, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 218–219, 485 N.E.2d 717, 720–721. "If there is substantial evidence in the record that, if believed, would convince the average mind of defendant's guilt beyond a

reasonable doubt, a court of appeals may not reverse a conviction as against the manifest weight of the evidence." *Hufnagel, supra,* citing *State v. Walker* (1978), 55 Ohio St.2d 208, 213, 9 O.O.3d 152, 154–155, 378 N.E.2d 1049, 1052.

Bryan argues that a reasonable doubt existed as to his guilt given the incredible testimony of the state's key witnesses, Christopher and Lovely, and the circumstances of the case.

 Bryan points to three inconsistencies between Christopher's trial testimony and the statement he gave during the November 17, 1993 interview with Detective Ryan. First, Bryan claims that Christopher stated in the interview that the anal penetration had been only "halfway," whereas at trial he testified that it had been complete. This alleged inconsistency was not brought out at trial and thus would not have been considered by the trial court in its decision. Moreover, although Bryan used specific portions of the interview transcript to impeach Christopher's trial testimony, the transcript was not introduced into evidence. Thus, it is not part of the record before us, and we have no way of reviewing this alleged inconsistency.

Second, Bryan claims that Christopher stated in the interview that he and Amanda had gotten into a fight and that he had punched and bitten Amanda, but that he denied this behavior on cross-examination. Our review of the record, however, reveals just the opposite. When asked on cross-examination if he had ever punched Amanda in the face, Christopher replied "Yeah." Christopher also admitted to having fought with Amanda. The state objected both times to this line of questioning, however, and the defense was not permitted to question Christopher further regarding the incident.

Third, Bryan asserts that Christopher told Detective Ryan during the interview that Amanda and Myra had tried to have sex in a sleeping bag, but that at trial he testified that it had been Bryan and Myra in the sleeping bag. Based on Christopher's testimony at trial, he appears to believe that he told Detective Ryan that it was Bryan and Myra in the sleeping bag, and not Amanda and Myra. In its report and recommendation, the court stated: "Christopher Harris' testimony was consistent and credible notwithstanding the fact that the incidents occurred over sixteen months ago. The court notes that his testimony regarding the sleeping bag incident with Bryan and Amanda or Bryan and Myra appears to be the major inconsistency. However, this did not damage his credibility." As the finder of fact is in the best position to weigh the credibility of witnesses and proffered testimony, *Walker, supra,* 55 Ohio St.2d at 213, 9 O.O.3d at 154–155, 378 N.E.2d at 1052, we defer to the trial court's finding with respect to the effect this inconsistency had on Christopher's credibility.

Next, Bryan points to inconsistencies within Christopher's direct examination testimony and between his direct and cross-examination testimony. First, Bryan argues that Christopher testified during direct examination that Bryan never touched him except with his penis, but that on cross-examination he testified that Bryan had also touched him with his hands. In the cross-examination testimony to which Bryan refers, Christopher stated that Bryan had sometimes undressed him, and then conceded that to undress him, Bryan must have had to touch him with more than his penis. As another inconsistency, Bryan asserts that Christopher testified that he had never seen a man's penis before, but that he had seen his parents having sex. We agree with the state that it is "patently possible" that Christopher could have seen his parents having sex without having seen his father's penis. With respect to Bryan's claim that Christopher testified that he told the "identical story" on the stand that he had told Detective Ryan during the interview, but then admitted that he had left some things out, we need only note that even if Christopher's statement to Detective Ryan was incomplete, it does not necessarily mean that it was inconsistent with his testimony at trial.

Bryan next argues that the circumstances of the case indicate that Christopher was not credible. Bryan points to the fact that Christopher testified that Bryan had sexually abused him almost every day for five weeks, that he was abused until the day before he left the Michael home, and that this abuse occurred in the morning, afternoon, evening, and in the middle of the night. Bryan argues that if so much abuse was occurring, it is "remarkable" that neither Elva nor Michelle Haynes saw any evidence of it, and that Christopher never bled as a result of it. With respect to Christopher's testimony of the sexual abuse, the court stated in its report and recommendation: "Christopher Harris gave credible testimony regarding his numerous sexual encounters. * * * [H]e gave descriptive and specific details when questioned about his sexual encounters with Bryan Michael. These encounters included anal sex and oral sex. Christopher Harris gave very graphic descriptions of Bryan Michael's pubic area, including the number of hairs, color of hairs, and penile size when in an erected state." Again, the finder of fact is in the best position to weigh the credibility of witnesses. Based upon our review of the record, we conclude that the trial court's characterization of Christopher's testimony was reasonable and reject Bryan's contention that Christopher's testimony was not credible.

Bryan also argues that Rose Lovely's credibility was so weak as to raise a reasonable doubt of guilt. As with Christopher, Bryan directs our attention to alleged inconsistencies in Lovely's testimony in support of his argument that Lovely was not credible. First, Bryan claims that Lovely told Detective Ryan that she had called her lawyer before taking Christopher and Myra to the hospital, but that on cross-examination she denied that she had called her lawyer

before she went to the hospital. In fact, Lovely merely stated that she could not remember if she had called her lawyer before she went to, or after she arrived at, the hospital. Next, Bryan argues that Lovely testified that she did not talk to Christopher about what had happened to him before taking him to the hospital, but that the hospital records indicate that Christopher had given a detailed history to Lovely about the sexual abuse. Although Lovely stated during cross-examination that she had not discussed the incidents with Christopher before taking him to the hospital, on direct examination she testified that she had a conversation with Christopher on the way to the hospital regarding what happened in the Michael home. Bryan also argues that, according to the hospital records, Lovely had stated that Bryan was not behaving abnormally. At trial, however, she testified that he had been behaving abnormally since being reunited with her. With respect to this, Lovely testified that the hospital had been asking specifically about abnormal *sexual* behavior and not just about Christopher's behavior in general.

Because there was no physical evidence of abuse in this case, the state's case hinged upon the credibility of Christopher's testimony. As we have already stated, the trial court found Christopher's testimony to be consistent and credible, and this finding is supported by the record. Without recounting his testimony in any more detail than we already have, we note that it provided substantial evidence that, if believed, would convince the average mind that Bryan was delinquent by reason of rape, attempted rape, and gross sexual imposition. Therefore, we cannot conclude that the verdict was against the manifest weight of the evidence.

The fourth assignment of error is overruled.

"V. The trial court erred by not allowing appellant to review prior to cross examination, records that appellee's expert referred to while testifying."

Bryan contends that the trial court erred in not allowing him to review Dr. Kline's records prior to cross-examining him because he had referred to the records during direct examination. The state argues that Dr. Kline did not refer to his records during his testimony.

With respect to writings used to refresh memory, Evid.R. 612 provides:

"[I]f a witness uses a writing to refresh his memory for the purpose of testifying, either: (1) while testifying; or (2) before testifying, if the court in its discretion determines it is necessary in the interests of justice, an adverse party is entitled to have the writing produced at the hearing. He is also entitled to inspect it, to cross-examine the witness thereon, and to introduce into evidence those portions which relate to the testimony of the witness."

Thus, the opposing party has an absolute right to examine a writing used to refresh a witness's recollection *while testifying* and to cross-examine the witness regarding it. If the writing is used to refresh recollection *before testifying,* however, it is within the trial court's discretion whether to permit the opposing party to examine the writing and to cross-examine on it. See *State v. Byrd* (1987), 35 Ohio App.3d 100, 519 N.E.2d 852; Staff Note to Evid.R. 612.

On direct examination, the following exchange took place between the state and Dr. Kline.

"Q: Before you go on, I notice you're getting ready to grab some paperwork. Can you tell us what that is that you're going to grab?

"A: This is just a file of information from when [Christopher and Myra] were in our office."

At this point, the state asked Dr. Kline a series of questions to establish that the records had been kept in the ordinary course of business. The examination then continued as follows.

"Q: Okay. And—okay, I was asking you if you could tell me what times the children were seen—those two children were seen in your office from when to where?

"A: The first occasion was in I believe September—about the 23rd of September, '93—

"Mr. Tepe: Your Honor, I'm going to object. * * * None of those records have been produced to me, and I strenuously object to this witness referring to records that have not been produced. * * * I don't want this witness reading from records that I have—that have not been provided to me—

"Mr. Cox: I don't have the records either. He just brought them today.

" * * * *

"Q: (By Mr. Cox): Were these records brought for the purpose of refreshing your recollection—

"A: I'll put them away. I can do without the records.

"The Court: Okay. Go ahead."

In his first question on cross-examination, Bryan's attorney asked to review Dr. Kline's records. The state objected, arguing that if the defense was given a chance to question Dr. Kline regarding the records, the state should be given one as well. Dr. Kline offered that he had brought the records voluntarily, and that he had not relied on the records when he testified. The court sustained the state's objection.

It appears from the record that Dr. Kline relied on the records, if at all, to answer one question on direct examination, which asked when he first started counseling Christopher and Myra. Under these circumstances, the trial court did not err in refusing to allow the defense to review Dr. Kline's records before cross-examining him.

The fifth assignment of error is overruled.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

GRADY and KERNS, JJ., concur.

JOSEPH D. KERNS, J., retired, of the Second Appellate District, sitting by assignment.