OPINION
Larry Bowman appeals from his conviction of three counts of rape and one count of kidnapping, following a jury trial. Bowman was originally indicted for one count of robbery, three counts of rape, and two counts of kidnapping. After the jury acquitted Bowman of the robbery charge and one count of kidnapping, Bowman was sentenced to a nine year term on one count of rape and two eight year terms on the other two rape counts. The rape counts were to be served consecutive to each other and concurrent with a five year sentence imposed on the kidnapping conviction.
In this case, the alleged rape victim was a 19 year old woman named Michelle Fincannon. Michelle and Bowman had met a few weeks before the alleged rape, at the Pazzazz Show Club. At the time, Michelle worked at Pazzazz as a stripper under the name "Deja" (as in deja vu). Bowman was a patron of the club. Michelle and Bowman became friends, but the extent and nature of their relationship was disputed at trial. Michelle acknowledged that she and Bowman were acquainted and had been out on one occasion, as friends. However, she testified that Bowman forcibly raped her vaginally and anally in the early morning hours of May 11, 1999, after dragging her upstairs to her bedroom and tying her to her bed. According to Michelle, she was able to escape after she took Bowman outside her apartment to give him money that was hidden in her car. By contrast, Bowman claimed the two had consensual sex that evening, as they had on two prior occasions.
The State presented evidence during its case that supported Michelle's version of events. For example, Michelle's neighbor, Chad Curry, testified that Michelle ran toward him as he walked to his car at about 4:15 a.m. on May 11, 1999. (Tr. 339, 345). According to Curry, Michelle had bare feet and was shouting, "Help me. He's going to kill me. He's going to kill me." (Tr. 346). Mr. Curry became afraid and jumped into his truck, but Michelle banged on the window and pleaded for help. She was crying and appeared to be panicking, "like something was wrong." (Tr. 356).
Another resident of the same apartment complex (Patricia Schaak), testified that she was asleep on the sofa when she heard a "loud banging" at her back door. (Tr. 400). When Mrs. Schaak went to the door, she saw a young girl, later identified as Michelle. (Tr. 401). Mrs. Schaak testified: "I thought she was going to break the door. I could hear her. Please let me in. Please let me in. He's trying to kill me." Id.
According to Mrs. Schaak, Michelle was "flailing" at the door. (Tr. 402). Mrs. Schaak opened the door and Michelle collapsed into her arms and onto the floor. Id. Michelle told her that someone had either tried to rape her or had raped her. (Tr. 402). At the time, Michelle's whole body was shaking and she was having trouble breathing. Id. Michelle also gave Mrs. Schaak the name of her assailant — a man named Larry. (Tr. 405). Mrs. Schaak then called 911. (Tr. 402).
Officer David Loop was dispatched to Mrs. Schaak's apartment. (Tr. 443-44). Upon arrival, Officer Loop observed Michelle "sitting in a fetal position in the dining room area of the apartment." (Tr. 444). Michelle was "crying hysterically." Id. She told Officer Loop that "somebody was trying to kill her" and that she had been raped. (Tr. 445).
Later the same day, after speaking with Michelle both at the hospital and at the police station, West Carrollton Detective, Donald Charles, and his partner, Detective Allison, located Bowman and questioned him about the events. Bowman admitted to the police that he had sex with Michelle, but claimed it was consensual. (Tr. 542 and 544).
Detective Charles took pictures of Michelle the day of the alleged rape as well as the day after. We have reviewed the photos, and they show various injuries, including a blackened right eye, swollen left hand, and bruises on the shoulders, wrist, and buttocks.
Dr. Kenneth Brock examined Michelle at Sycamore Hospital on May 11, 1999. (Tr. 605-06, 608). Dr. Brock noted swelling and tenderness in Michelle's left hand, tenderness in the lower abdomen, just above the pubic area, bruising to the right external labia of the vagina and to the vagina itself, and tenderness to the cervix, the fungus (womb), and the tubes and ovaries. (Tr. 609, 619-20, 621-23). Additionally, Dr. Brock took a vaginal aspirate which, when viewed under a microscope, revealed motile sperm. (Tr. 617). According to Dr. Brock, the presence of motile sperm meant that Michelle had intercourse within the past forty-eight hours. Dr. Brock found the rectum area "grossly normal," meaning that it looked normal, with no tearing or bleeding in the rectal area. The nurse who assisted with the exam indicated that the doctor took swabs of the vaginal and anal area. She did not see the doctor enter the anus with any swabs. Instead, he twirled the swab around the outside of the anal area.
Annette Davis of the Miami Valley Regional Crime Lab tested semen stains that were identified on items received from Sycamore Hospital, including the vaginal aspirate, vaginal swabs and anal swabs. (Tr. 484). Ms. Davis found type A blood grouping standards on both the vaginal and anal swabs. (Tr. 486). Ms. Davis testified that, since Michelle was a type B secretor, the type A blood was foreign to Michelle and had to originate from the semen donor. (Tr. 485, 489). The type A blood was consistent with Bowman, who was a type A secretor.
Bowman testified at trial on his own behalf. On certain points, Bowman's testimony was consistent with that of Michelle. For example, they both agreed that they met at Pazzazz a few weeks before the alleged rape. At the time, Bowman was living with another woman, but Michelle did not know this. When Bowman and Michelle met, they discussed ideas Michelle had for marketing a t-shirt with a marijuana logo. Bowman gave Michelle some helpful advice and also gave Michelle his pager number.
As we mentioned, the alleged rape took place in the early morning hours of Tuesday, May 11, 1999. Michelle had last worked at Pazzazz the previous Thursday, and was out of town over the weekend, visiting her family in Maryland. Specifically, Michelle was gone from Friday until Monday evening, around 8:00 p.m. When she returned, she called a number of friends, including Bowman, to let them know she was home. Michelle testified that Bowman asked to come over, but she refused because she was tired from the trip. Bowman's story was that Michelle asked him to come over and they made plans to see each other later that night. However, no particular time was specified. Bowman ended up going to Michelle's apartment at around 2:30 a.m. Both parties agree that Michelle called 911 at about 2:58 a.m., when she heard knocking at her door. Michelle indicated that she was scared because she did not know who was at the door. Bowman agreed that he had scared Michelle. However, Bowman testified that Michelle was also scared because she had gotten threatening phone calls from an ex-boyfriend in Chicago (Brandon), who worked for a company called Currie Motors. According to Bowman, Brandon was threatening Michelle because she had cashed checks which were stolen from Currie.
In any event, the police arrived at about 3:02 a.m., in response to the 911 call. By that time, Michelle had realized Bowman was at the door and had let him in the apartment. Michelle told the police that everything was all right, and they left at about 3:03 a.m.
Bowman testified that he and Michelle had consensual sex after the police left, as they had on two prior occasions. On the night of the alleged rape, they had "regular" sex, and he also tried to have anal sex, but stopped because Michelle said it hurt. After they finished, Bowman told Michelle that he had to go because it was late and he had to work in a few hours. At that time, Michelle became irate and told Bowman that he was just like everyone else, i.e, all he wanted to do was use her. An argument of some intensity ensued, and on the way out of the house, Bowman pushed Michelle and hit her in the eye with his elbow. Michelle followed him out the door and her puppy came out, too.
About fifteen feet from the door, Michelle reached out to grab Bowman and he broke his pager. When he reached down to pick it up, he heard a man's voice say, "I know you. Who the hell are you." Michelle then said, "Oh, my God." At that time, Bowman saw another man coming out of the parking lot, with gold teeth and dark hair, wearing a red "Nike" top. Bowman was scared and ran away, because Michelle had told him people were coming to kill her. He also knew she had changed her phone number and that the bank was looking for her. He also thought he was being set up, i.e., people had told him that strippers routinely invited men over and then called their boyfriends or pimps to rob them. As a result, Bowman ran away and went back to the apartment he shared with his girlfriend, Nicole.
By way of contrast, Michelle testified that she told Bowman not to come over that night because she was tired. She went to bed, but thought she heard noises about 2:40 a.m. After finding that someone was banging on the door, she called 911, but retracted the call when she realized Bowman was at the door. After the police arrived and were sent away, she and Bowman sat down in the living room. Suddenly, Bowman hit her on the right side of her head. He then attacked her, threatened to kill her, dragged her upstairs, and raped her. During the attack, Michelle told Bowman that she had money and a gun in the car. They then went outside to retrieve the money and gun. At that point, her neighbor, Chad, came out and she ran towards him, screaming. Chad was not able to identify Bowman. When questioned immediately after the incident, Chad told the police that the person he saw might have had on a red tank top. (In contrast, Bowman had on a white shirt and shorts).
Bowman was charged with robbery and kidnapping, based on the events in the parking lot. However, the jury acquitted him of those charges. He was also charged with two counts for vaginal rapes, one count for the anal rape, and one count of kidnapping connected to the rape charges. The jury found him guilty of these charges, and he was sentenced as noted above.
 I
In the first assignment of error, Bowman contends that his statement to the police should not have been admitted into evidence since he did not waive his Miranda rights before giving a statement. In support of this assignment of error, Bowman says the evidence showed that he was asked to go to the police department with Detective Charles and that the interview took place in the "custodial" setting of the detective's office.
In response, the State argues that the police were not required to comply with Miranda requirements because Bowman was not in custody when he was questioned. The State also argues that Bowman waived his right to challenge the admission of his statements by failing to file a pretrial suppression motion.
Failure to file a motion to suppress within the time specified by Crim.R. 12(C) waives any objection to admission of the evidence or statement. See Crim.R. 12(G) and State v. Wade (1978), 53 Ohio St.2d 182, paragraph three of the syllabus, vacated on other grounds (1978),438 U.S. 911, 98 S.Ct. 3138, 57 L.Ed.2d 1157. A review of the record in this case indicates that Bowman did not file a motion to suppress the challenged statements.
Furthermore, the warnings set out in Miranda v. Arizona (1966),384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, are required only when a suspect is subjected to custodial interrogation. The United States Supreme Court defines custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id.
at 444, 86 S.Ct. 1612, 16 L.Ed.2d 704. Accordingly, police are not required to administer Miranda warnings to every individual they question. Oregon v. Mathiason (1977), 429 U.S. 492, 495, 97 S.Ct. 711,50 L.Ed.2d 714, and State v. Biros (1997), 78 Ohio St.3d 426, 440. The fact that a questioned person is one whom the police suspect, standing alone, does not trigger the requirement for Miranda warnings. Mathiason; Biros,supra. Rather, the Supreme Court of Ohio has explained:
 The determination whether a custodial interrogation has occurred requires an inquiry into "how a reasonable man in the suspect's position would have understood his situation." * * * "[T]he ultimate inquiry is simply whether there is a `formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest.
Biros, 78 Ohio St.3d at 440 (citations omitted). See also, California v.Beheler (1983), 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520,77 L.Ed.2d 1275, 1279.
In this case, Detectives Charles and Allison first questioned Bowman at his apartment in the presence of his girlfriend, Nicole Sabatino. They then talked to him outside his apartment briefly and asked him if he would accompany them to the police department for further questioning. Bowman testified that when the detectives asked him to come down to the station, he said, "I am going to get my shirt. Tell Nicole I will be back." (Tr. 669). Bowman further said that the detectives repeatedly told him they would bring him back in a couple of hours. (Tr. 670). And, the record is devoid of any evidence that Bowman was prevented from leaving the police station once he arrived.
We agree with the State that a reasonable person in Bowman's position would not have believed he was under arrest or under restraint of freedom of the degree "associated with a formal arrest" at the time he was interviewed by the detectives. Moreover, Bowman did sign a pre-interview form, waiving his rights, and the charge of "rape" was clearly marked on the form. Based on the preceding discussion, the first assignment of error is overruled.
 II
In the second assignment of error, Bowman contends his conviction was against the manifest weight of the evidence. In particular, Bowman notes that Michelle Fincannon's credibility was seriously damaged by medical testimony that her rectum looked completely normal despite her claim that she was violently anally raped.
The State argues that the conviction was not against the manifest weight of the evidence as there was substantial evidence to support the jury's verdict. The State claims that anal swabs of Michelle Fincannon's anus revealed a blood type foreign to her but consistent with Bowman's blood type. The State also notes the jury was in the best position to evaluate the credibility of Ms. Fincannon and the witnesses who observed and heard Ms. Fincannon shortly after the rape occurred. As we mentioned above, the testimony and forensic evidence presented by the State demonstrated that the defendant's sexual conduct with Ms. Fincannon was nonconsensual. Although we think the evidence of the anal rape was not particularly strong, we cannot say that "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins (1997),78 Ohio St.3d 380, 387. The second assignment of error is overruled.
 III
In the third assignment of error, Bowman contends the trial court erred in permitting the prosecution to question him about the details of his prior conviction of felonious assault.
On direct examination, Bowman admitted that he had a prior conviction for felonious assault. Subsequently, during cross-examination, the prosecutor questioned Bowman at length about the details of the offense. Bowman's counsel objected but the trial court permitted the questioning stating, "I would not allow this except your client opened the door to this." (Tr. 679). Thereafter, the prosecutor was permitted to ask Bowman over objection whether he had busted the victim's head open with a carpenter's tool or lead pipe. (Tr. 680-81).
Evid.R. 609(A)(1) permits evidence that the defendant has been convicted of a felony for purposes of impeaching the defendant's credibility. The fact of the conviction may be proved by the testimony of the defendant on direct or cross-examination. Evid.R. 609(F). However, the trial court may limit questioning which asks more than the name of the prior conviction, the time and place of conviction, and the punishment. State v. Wright (1990), 48 Ohio St.3d 5.
We agree with Bowman that he did not open the door to the prosecutor's questions merely by admitting his prior conviction on direct examination. Defense attorneys commonly use this technique to take the "sting" out of a conviction before cross-examination. Nonetheless, permitting evidence beyond the fact of conviction creates a danger that the jury will use details of the prior crime for some purpose other than impeaching a defendant's credibility.
Consequently, the trial court did err in permitting the prosecutor to pursue the underlying facts of Bowman's prior conviction. The prior assault did not involve a female, nor was it sexually oriented. We think once the jury learned Bowman had committed a felonious assault, the damage to credibility was complete and the details were not relevant to the jury's consideration of the charges in this case. However, we agree with the State that admitting the evidence was harmless error. The error was not materially prejudicial to the appellant. The remaining evidence which was properly introduced overwhelmingly established appellant's guilt. See, State v. Williams (1988), 38 Ohio St.3d 346, at 350, 351.
In view of the preceding discussion, the third assignment of error is overruled.
 IV
The fourth assignment of error is based on the trial court's alleged error in denying Bowman the opportunity to cross-examine Ms. Fincannon about whether she was involved in an elaborate scheme of cashing illegal checks of over $17,000 from Chicago, Illinois. The State argues that nothing in the trial record reflects that the trial court limited this area of cross-examination.
In reviewing the transcript, we note that Bowman's counsel was allowed to ask Michelle about cashing checks for a friend in Chicago. During cross-examination, Michelle denied cashing checks for anyone, and further denied that any banks in Dayton were looking for her about bad checks. At that point, the State objected, and a sidebar conference was held. The court did not indicate if the objection was sustained or overruled, did not strike the answer, and did not give the jury any instructions. Instead, after the sidebar (which was not recorded), the court simply said, "Let's move on." Defense counsel then asked Michelle if she called 911 so quickly the night of the incident because she was afraid someone was looking for her. She denied this. Defense counsel then changed the subject and asked Michelle about other matters. In view of these facts, we do not find that the trial court limited the cross-examination of the complaining witness — or at least the record does not reflect a limitation.
What Bowman is really complaining about (although not articulated clearly in the assignment of error) is the trial court's refusal to admit extrinsic evidence about the alleged check cashing scheme. Specifically, after the State rested, the defense asked to put on a witness from Key Bank to identify and discuss checks deposited into Michelle's bank account in March, 1999. The court rejected this attempt, and the following evidence was then proffered. Two checks were deposited, totaling $17,200.20. These checks were drawn on Currie Motors and were ultimately returned to Key Bank as "referred to maker." However, Key Bank did not suffer a loss on the checks and did not institute prosecution. Instead, the loss was suffered either by Currie Motors or another bank. Further, the employee from Key Bank who testified on proffer had not talked to Michelle about the checks.
The trial court's rejection of the evidence was based on Evid. R. 608(B), which prohibits proof by extrinsic evidence of specific instances of a witness' conduct for the purpose of attacking his or her character for truthfulness. Because Michelle was cross-examined on the subject and denied cashing fraudulent checks, the court held that the defense could not bring in extrinsic evidence which had no purpose other than to show that Michelle was not telling the truth.
We agree with the trial court. We have previously held that if a witness denies certain conduct on cross-examination, the opponent is "stuck" with the answer and may not introduce extrinsic evidence unless the conduct is relevant to something besides credibility. In re Michael
(1997), 119 Ohio App.3d 112, 126-27. At trial, Bowman argued that the proffered evidence was relevant to Michelle's motive for accusing him of rape. However, we fail to see the connection. Accordingly, the trial court did not err in rejecting evidence from the Key Bank employee.
Based on the above discussion, the fourth assignment of error is overruled.
 V
In the final assignment of error, Bowman claims the trial court erred in permitting the State to introduce certain evidence found by the police at Michelle Fincannon's apartment, to wit, a knife, a pair of latex gloves, and marijuana. Notably, the State does not claim in its brief that this evidence was relevant. Further, there is no evidence that Bowman used a knife, wore gloves, or used marijuana at the time of the offense. There was evidence from the victim that the items did not belong to her and were found in the apartment after Bowman had been there. Under the circumstances, we agree that the trial court erred in admitting this evidence, since it was irrelevant. However, the admission was harmless error. Although Bowman claims these items were "mysterious and dangerous," and therefore, prejudiced the jury, the record does not convince us that any prejudice occurred. As a result, the fifth assignment of error is without merit and is overruled.
The judgment of the trial court is Affirmed.
YOUNG, J., concurs.