JOURNAL ENTRY AND OPINION
Defendant-appellant Jeffrey B. Kellon (Kellon; d.o.b. March 4, 1966) appeals from his jury trial conviction of four counts of corruption of a minor (counts 3, 6, 9 and 13) and one count of possession of criminal tools, to-wit, a battery-powered silver-colored vibrator (count 14).[1]
For the reasons adduced below, we affirm.
A review of the voluminous record on appeal indicates that Kellon, an African-American who was approximately thirty-one (31) years of age at the time of the January 2000 trial herein, was charged with committing the offenses named above between July and August of 1998.[2] Kellon's wife of ten years, Julie Kellon, is Caucasian and is employed as a nurse at the Cleveland Clinic Hospital; the couple have two children, an infant boy and a seven-year-old girl. The victim, Candice Baumgartner (Candice)[3], who was the State's principal witness at trial, was an adolescent Caucasian female who was approximately seventeen (17) years of age at the time of trial and fifteen-and-a-half (15/) years of age at the time of the offenses herein, and was born on January 4, 1983. Candice was a freshman student at Cleveland Heights High School and a member of the track team at the time of the offenses herein.[4] At the time of the offenses Kellon was employed as a county probation officer and a part-time assistant track coach at Cleveland Heights High School.
The testimony reflects that the Kellons hired Candice as a babysitter for the Kellons' two children in their home in the summer of 1998. Prior to working as the babysitter, Candice testified that Kellon engaged her in conversations in April of 1998 and told her that he and his wife had an open marriage and that he had had some extramarital affairs, one involving a girl around Candice's age before Kellon had married. Tr. 1016-1019. According to Candice, Kellon also inquired as to whether Candice was a virgin; Candice claimed to being a virgin, to-wit, she never had engaged in sexual intercourse. Tr. 1019-1020, Candice also testified to a series of episodes involving sexual misconduct between herself and Kellon. The first episode allegedly occurred on the early afternoon of July 6, 1998, when Kellon took her on a motorcycle ride to a local park. While on a path deep in the wood in the park, by a stream, and for approximately twenty minutes, Kellon allegedly French kissed her repeatedly, touched her chest, licked the inner thighs of her legs, removed her shorts and underwear and placed his finger and tongue into her vagina. Candice did not object to these actions except to tell him, after approximately twenty-five minutes of the foreplay, that she had to be home by 4:00 p.m. Tr. 1046-1057, 1062. Candice identified a series of photographic exhibits of the park location as the area where they had parked and where the sexual impropriety had taken place. Tr. 1041-1046, 1064-1065. Candice, on the night of the episode, recorded the episode events in detail in a journal, the contents of which were admitted into evidence. Tr. 1067-1070.[5]
The second episode allegedly occurred on an evening in early July 1998, while at Kellon's home. At that time, Kellon had allegedly telephoned Candice requesting that she come to his house to do some housekeeping. Tr. 1077. Mrs. Kellon and the Kellons' older daughter were not at home but the Kellons' infant was at home with Kellon. While at the home, Kellon, over a ten-minute period, allegedly put his hands down her pants and placed his finger into her vagina. Again, Candice did not voice any objections to Kellon's advances, except to tell him that she had to be home by 11:00 p.m. Tr. 1082-1084.
The third episode allegedly occurred on an early August 1998 evening at Kellon's home. Candice had been called there to babysit, yet Kellon was the only person at the home when she arrived. During this twenty-five minute event, Candice was allegedly near the couch when Kellon unzipped her pants and placed his finger and tongue into her vagina. Candice also alleged that Kellon licked her legs, unzipped his pants, and put his erect penis into her mouth for several minutes. Tr. 1089, 1136. Again, Candice did not voice any objection to these actions at the time, except to tell him that she had to be home by a certain hour. Before leaving, Kellon gave her $10. Tr. 1094.
The fourth episode allegedly occurred on a Thursday morning in middle August 1998, at Kellon's home. She remembered Thursdays because that was the only day of the week that Kellon went into work late. Tr. 1095. Candice was called to the home to babysit and when she arrived she found only Kellon and his infant son at home.[6] Kellon instructed Candice to place the infant in a portable crib and go to the computer room. In the computer room, Kellon undressed her completely and she laid down on the floor. Kellon began touching her chest and then placed his finger and tongue into her vagina. Tr. 1101. Next, Candice stated that he took a silver-colored vibrator from his pocket, inserted it into her vagina and then turned it on. Tr. 1102. Candice identified for the police the silver-colored, battery operated vibrator seized during a search of Kellon's home as the device which Kellon had used on her. Id., see State's Exhibit 2. At the time of this misconduct, Candice remembered that the Jenny Jones television show was playing on the television, so it was between 10 and 11:00 a.m. Tr. 1103-1104. Later that day, after Kellon had left for work, Kellon telephoned the home and told Candice that he had left some shorts on the first floor and asked her to retrieve them and put them upstairs in his dresser drawer. Candice complied with this request and, in doing so, found a nature color condom in a pocket of the shorts. Tr. 1105-1106. Candice identified the condom contained in State's Exhibit 10, seized at Kellon's home, as being a nature colored condom. Tr. 1106. Shortly after this fourth episode and having been scared in finding the condom, Candice informed Kellon that the sex between them had to stop; apart from several subtle unsuccessful advances, Kellon acquiesced to her request. Tr. 1113-1117.
Candice stated that at no time did Kellon use force or threaten her during the commission of these serial offenses. Tr. 1108. Candice also stated that she and her father did not always get along, and that Kellon and Mrs. Kellon knew this because she told them. Tr. 1110-1111, 1204. On cross-examination, Candice admitted to talking to Mrs. Kellon about interracial marriages, telling her that she (Candice) was dating an African-American person in late August of 1998, and had problems with her father, whom she considered a racist, when she dated an African-American boy when she was in the eighth grade. Tr. 1205.
Candice continued to babysit for the Kellons on Thursdays only after school during September through November of 1998. Tr. 1112-1113.
Candice claimed that these offenses, and the mental strain flowing from them, caused her to sustain psychic trauma, seek professional counseling, and suffer deteriorating grades at school (from A's and B's, to C's and D's). Tr. 1117, 1123-1125, 1127, 1134. Candice broached the subject of the sexual misconduct to another track coach at the school, Coach Claude Holland, by using a hypothetical situation in a note. Coach Holland later talked to her and Candice admitted that she was the person who experienced the sexual misconduct, but falsely indicated that it was one of her father's friends who was the perpetrator. Tr. 1120-1121. Coach Holland, accompanied by Candice, then reported the misconduct to Miss Cavor, the tenth grade principal at the school. Tr. 1121-1122.[7]
Eventually, on December 2, 1998, Candice, accompanied by her parents, talked to the police and told them what had happened.
On cross-examination, the time frame for the episodes was narrowed down by the defense to, approximately, two weeks in July and two weeks in August. Tr. 1219-1223. However, Candice did say that the fourth episode could have occurred on the morning of either August 13, 20 or 27, in 1998, and that whatever the date of the fourth episode, Mrs. Kellon and her daughter were not at home, but the infant son was at home. Tr. 1225-1226. Candice, in response to defense questioning, stated that her relationship with one Robert Austin changed after August 21, 1998; that she did not permit further sexual encounters. Tr. 1239. At that point, Candice admitted to having a one-time romantic relationship with Master Austin at her house, but she did not tell her parents or Mrs. Kellon of this development. Tr. 1278-1280. Candice also testified on cross-examination that she did not tell Mrs. Kellon about it (becoming romantically involved with Robert Austin) prior to Candice's visit to Planned Parenthood. Tr. 1278.
On re-direct examination, Candice testified that Mrs. Kellon took her to Planned Parenthood without Candice's parents' knowledge and wishes. Tr. 1281. In Candice's opinion, having sex means vaginal intercourse so she did not consider Kellon's sexual misconduct with her to be having sex. Tr. 1287.
Mrs. Kellon stated that she and her two children were in New York between June 30 to July 6, 1998, and that Kellon was home by himself on June 6, 1998 in Cleveland Heights (which was the date of the first episode alleged by Candice). She also testified that she was very busy during the summer of 1998, dividing her time between working at two jobs (her primary employment at Mt. Sinai Hospital and her secondary employment at Cleveland Clinic; she began her orientation at the Cleveland Clinic on July 20, 1998, which orientation was on Mondays through Thursdays from 8:00 a.m. to 5:00 p.m.) and also attending summer school classes to become a midwife. Her hospital employment at Mt. Sinai Hospital required her to work the entire night from either 7:00 p.m. to 7:00 a.m. or 1:00 p.m. to 7:00 a.m., necessitating someone to watch her children during the day so that she could work at the Cleveland Clinic orientation, study or sleep as the case might be. She denied being out of town during the first two weeks of August in 1998, but did admit to working one evening shift during that period, on the evening of August 13, 1998; this was the only evening she was away from home during the first two weeks of August, and Kellon and the children were at the home. Tr. 1384. In August of 1998, other than the period of August 2 through August 7, her daughter was at the home. Tr. 1385. Mrs. Kellon claimed that she was not at home on the morning and afternoon of Thursday, August 20, 1998, but that her children and husband were at home when she left the house to attend a class in Bellevue, Ohio. Tr. 1385. Mrs. Kellon claimed to be at home with her daughter during the day on Thursday, August 27, 1998, but remembered that her daughter attended a local sports camp from 9:00 a.m. to 1:00 p.m. during the last two weeks of the summer in 1998. Tr. 1386-1388. Mrs. Kellon denied any knowledge of a sexual relationship between her husband and Candice. The witness also testified that Candice had confided in her that Candice's father disapproved of interracial dating and that Candice had been dating an African-American boy. Tr. 1395-1396. Candice also allegedly told Mrs. Kellon of some physical discomfort she was experiencing with painful menstrual cramping, to which Mrs. Kellon offered medical advice to the victim; that she should get some ibuprofen or oral contraceptives to ease the pain. Tr. 1397-1398. Candice allegedly informed Mrs. Kellon that her mother disapproved of birth control pills for Candice, and Mrs. Kellon told Candice about the services offered by Planned Parenthood which were available without parental consent for a female. Tr. 1399. Candice then allegedly asked Mrs. Kellon to take her to Planned Parenthood to get birth control pills. Tr. 1399-1400. Mrs. Kellon took Candice to Planned Parenthood on August 21, 1998, because the witness knew of Candice dating an African-American and her father's negative view of this relationship should he find out about it, and her concern was to alleviate the painful menstrual cramping and to stop any risk of pregnancy so that Candice's father would not find out about Candice's interracial adolescent relationship. Tr. 1400-1402. Mrs. Kellon then testified that the police searched the Kellons' home on the Wednesday after Thanksgiving in 1998. Tr. 1410.
On cross-examination, Mrs. Kellon testified that she had written some of the entries on a calendar after the police had searched her home; the calendar entries reflected the dates and times that Candice had performed babysitting duties at the Kellon home, and the dates that Mrs. Kellon was home, and that some of these entries, exclusive of times only, were six or seven months after the actual event. Tr. 1424-1425. The record reflects that some of the time entries and schedules on Mrs. Kellon's calendar do not correspond to time entries and schedules for the same date in other exhibits, and that the calendar did not contain all of the times that Candice worked for the Kellons. Tr. 1425-1433. The witness testified that she had no written documentation of what evening Candice babysat in July or August of 1998. Tr. 1441. Mrs. Kellon did not consider Candice to be a racist because Candice was interested in a young man of African-American descent and had discussed interracial marriages with her. Tr. 1454. Candice never told her that she (Candice) was interested in Robert Austin, and the witness did not know what kind of relationship Candice had with Robert Austin. Tr. 1455-1456. The witness claimed that the condoms and the two vibrators, found in the bedroom night stand during the search of the Kellons' home, were her and her husband's property. Tr. 1474. The witness stated that it was Candice's idea that she actually go to Planned Parenthood; the witness did not take Candice there with the intent that Candice be provided birth control pills, only that she be able to talk to the service providers about her options. Tr. 1487-1490. She knew of no inappropriate conduct going on between her husband and Candice, and was not trying to foster such conduct by taking Candice to get birth control pills at Planned Parenthood. Tr. 1492. According to the witness, it was after the trip to Planned Parenthood that her husband knew of the birth control pills and the trip to Planned Parenthood, but she could not recall with precision the date of his acquiring such knowledge. Tr. 1492-1493.
On re-direct examination, Mrs. Kellon, as she had been on direct examination, was questioned again with regard to the dates and times when she and her children were at home or at work/camp during July and August of 1998. Mrs. Kellon also repeated her denial that she facilitated the alleged improper sexual conduct between her husband and Candice.
On re-cross examination, the State challenged Mrs. Kellon about her recollection of activities, dates and times, during the July-August period of 1998, and continued to explore the State's theory that she took Candice to Planned Parenthood in order to help facilitate her husband's sexual conduct with Candice.
Kellon, testifying on his own behalf for the defense, denied having committed any of the sexual misconduct identified by the prosecution with regard to Candice. Tr. 1532. Kellon testified that, after arriving home from New York, he attended a barbeque at his parents' home in Cleveland Heights on July 5, 1998, until midnight. On July 6, 1998, Kellon claimed that he visited with his sister who was staying at his parents' home, arriving there at approximately 12:45 p.m. and leaving at approximately 3:15 p.m. According to Kellon, his mother dropped him off at his house with her car.
Kellon also testified that he was aware of a relationship between Candice and Robert Austin. Tr. 1554-1555. He denied having a sexual or romantic relationship with another babysitter and track team member, Julia Pankhurst, whose photograph, in which she was standing in a full-length prom-type dress, was found in his office at work. Tr. 1557. Kellon identified his time sheets from the probation department, showing when he worked during July-August in 1998. After reviewing his time sheets, Kellon compared the dates and times in the employment time sheets with Defendant's Exhibit 11/State's Exhibit 1, which are the same document, and concluded that Exhibit 11/Exhibit 1 had inaccuracies for a number of days and times in it. Specifically, the inaccuracies were reflected for: (1) Thursday, July 16, 1998 (instead of working from 2 to 7 p.m., he worked from 11:58 a.m. to 7 p.m.); (2) Monday, July 20, 1998 (instead of signing in at 7 a.m., he signed in at 6:55 a.m.); (3) Tuesday July 28, 1998 (instead of working from 9 a.m. to 6 p.m., he worked from 7 a.m. to 1 p.m.); (4) August 3, 1998 (instead of working from 7 a.m. to 3 p.m., he worked from 6 a.m. to 2 p.m.); (5) Friday, August 21, 1998 (instead of 7 a.m. to 1:30 p.m., he worked from 7 a.m. to 1:50 p.m.). See Tr. 1563-1567. Kellon testified that his daughter attended a daily local sports camp from 9:30 a.m. to 3:30 p.m., Monday through Friday, between July 13 though July 31, 1998; Kellon claimed to pick his daughter and her friend up after class on each day of the week, except Thursdays, having to leave work downtown by 3:00 p.m. Before going to the camp, Kellon would go to his house from work, get the family car and his infant son, and then go to the camp to get his daughter and her friend, then go home with the children. Kellon claimed to never being with Candice during the evening hours in July of 1998.
Kellon also testified that his wife was not at home on the Thursday mornings of August 6 and 20, 1998, but that Candice did babysit on those days, arriving at 8:00 a.m. Mrs. Kellon worked on Sunday, August 2, 1998, from 10:53 p.m. to 7:23 a.m., and worked on Thursday evening, August 13, 1998, to 11 p.m. His daughter was also at camp, overnight, from August 2 through August 7, 1998. The Kellons also traveled to New York State from late August through early September. Despite reviewing work schedules and speaking with family and friends, he had no recollection of precise events for each and every day of July-August 1998. Candice was in the Kellon house with Kellon on each Thursday morning in August, 1998. Kellon claimed that his daughter was home on Thursday, August 20, but not on Thursday, August 27, 1998. Kellon claimed that his wife was not home on Thursday, August 20, 1998, because she had left for a class in Bellevue, Ohio for that day. Kellon's son was in the house on each Thursday in August, 1998. Kellon admitted to having back problems caused by a herniated disk.
Kellon next testified on direct examination that he first met Robert Austin in late 1997 and that he never encouraged Candice to have any kind of relationship other than friendship with Austin. Tr. 1592.
On cross-examination, Kellon admitted to stopping his practice of shaving his head bald, and instead letting his hair grow out; a decision he did not make on advice of his defense counsel, and did not do so in an attempt to present a better impression to the jury. Tr. 1595-1597. Kellon also denied asking Candice whether she was a virgin. Tr. 1608. Kellon thought Candice was a trustworthy, responsible, and credible person. Tr. 1609-1610. Candice allegedly confided in him concerning her home life situation. He also stated that he cleaned the house on the morning of July 6, 1998, before going to visit his sister at his parents' house so he would have had no reason to call Candice to come over and clean his house that day; but he did admit to calling Candice at 11:00 a.m. on July 6 to remind her that she was to babysit on July 8, 1998. Tr. 1627. His bad back did not prevent him from weight lifting, running, or enlisting in the U.S. Marine Corps for four years. Tr. 1630. Kellon then denied speaking with Robert Austin concerning sexual conduct by Austin and/or certain unnamed girls. Tr. 1632-1633. Kellon next testified that he did not use the vibrators, but that he would use them on his wife approximately twice each month and that sometimes he would wash them and sometimes his wife would wash them. Tr. 1784-1786. Kellon admitted to using condoms, but denied carrying them outside his house. Tr. 1786-1787. On more than one occasion in his life, but not with Candice and not at the wooded location in question in this case, he had taken girls on walks in the woods for romantic purposes; he used the woods because it was secluded. Tr. 1803-1804. The witness also denied dropping Candice off at any person's house, including Dan Barnes' house, except for Candice's grandmother's house. Tr. 1814, 1816. In July/August of 1998, his wife did leave the house during evenings without him, leaving him alone with just his infant son. Tr. 1830. Kellon also admitted that he liked oral sex. Tr. 1866.
On re-direct examination by the defense, Kellon admitted that his hair style and facial hair (goatee and mustache) has changed over the years and that he kept a number of family photographs, which he identified in court from defense exhibits, at his office in the probation department. Tr. 1875-1881.
Kellon was convicted and subsequently sentenced on September 8, 2000, to the following: (1) six months on count 3; (2) seven months on count 6; (3) eight months on count 9; (4) nine months on counts 13 and 14; (5) all sentences to run concurrent.
Appellant presents three assignments of error for review.
The first assignment of error provides:
 I IN A PROSECUTION FOR ALLEGED SEXUAL OFFENSES IN WHICH THE STATE'S CASE RESTED ALMOST ENTIRELY UPON THE TESTIMONY OF A SINGLE WITNESS, APPELLANT WAS DENIED A FAIR TRIAL AS A RESULT OF IMPROPER LIMITATION UPON CROSS EXAMINATION OF THE STATE'S PRINCIPAL WITNESS, ERRONEOUS EXCLUSION OF EVIDENCE THAT WOULD HAVE SUBSTANTIALLY UNDERMINED THE CREDIBILITY OF THE STATE'S PRINCIPAL WITNESS, IMPERMISSIBLE ADMISSION OF HEARSAY TESTIMONY ERRONEOUSLY RECEIVED FOR THE PURPOSE OF BOLSTERING THE CREDIBILITY OF THE STATE'S PRINCIPAL WITNESS, AND IMPROPER ARGUMENT BY THE PROSECUTOR ON THE BASIS OF SUCH ERRONEOUS RULINGS.
In order to promote a coherent review, each of the four sub-arguments which are addressed seriatim in this assignment by the parties, will be addressed separately by this court. The first sub-argument provides:
 A. In violation of Article I, Section 10 of the Ohio Constitution, and the Sixth and Fourteenth Amendments of the Constitution of the United States, the Trial Court Improperly Limited the Right to Cross Examine the State's Principal Witness on Material Aspects of Her Testimony Which Were Critical to An Assessment of the Witness' Credibility.
In this sub-argument, appellant argues that the trial court erred in granting the State's motion in limine which precluded the defense from presenting evidence which would have allegedly challenged Candice's credibility and offered an alternative explanation for Candice's behavior which corroborated her accusations of sexual misconduct. The specific evidence which the defense sought to introduce concerned the defense theory that Candice, in making the allegedly false charges of sexual misconduct against Kellon, was attempting to influence an African-American male student at Cleveland Heights High School into initiating a sexual relationship with her. The defense sought to argue that this male student, Robert Austin, who Candice had known since they attended elementary school together and was a member of the high school's track team, had been dating Candice's friend (Melissa Conshi) and Candice desired to lure him away from that friend by enticing Austin with the promise of sex.[8] By making these allegedly false charges of sexual misconduct against Kellon, the defense theory posited that Candice was promoting jealousy in Austin which would make her more desirable to Austin. The defense further argued that Austin's alleged rejection of Candice was the true cause for Candice's psychic trauma and deteriorating grades. The court ruled that such evidence by the defense would violate R.C. 2907.02(D), Ohio's Rape Shield Law.
The first paragraph of R.C. 2907.02(D) provides as follows:
 (D) Evidence of specific instances of the victim's sexual activity, opinion evidence of the victim's sexual activity, and reputation evidence of the victim's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value. (Italicization added.)
With regard to the evidentiary prohibition presented by the rape shield law, this court recently stated the following in State v. Brisco (Aug. 24, 2000), Cuyahoga App. No. 76125, unreported, 2000 Ohio App. LEXIS 3835 at 12-13:
 The rape shield statute is not always applied literally, as in some instances it might infringe upon a defendant's constitutional right to confront witnesses.
 State v. Gardner (1979), 59 Ohio St.2d 14, 16-17, 391 N.E.2d 337, 340. To protect the defendant's constitutional right, the trial judge must balance the purpose of the evidence and its probative value against the interests protected by the rape shield statute.
Id.
The rape shield statute serves several state interests, as stated in Gardner:
 First, by guarding the complainant's sexual privacy and protecting her from undue harassment, the law discourages the tendency in rape cases to try the victim rather than the defendant. In line with this, the law may encourage the reporting of rape, thus aiding crime prevention. Finally, by excluding evidence that is unduly inflammatory and prejudicial, while being only marginally probative, the statute is intended to aid in the truth-finding process.
 Id., 59 Ohio St. 2d at 17-18. The judge has discretion to determine the relevance of evidence and apply R.C. 2907.02(D) in the first instance, and we therefore review a judge's action for abuse of discretion. In re Michael (1997), 119 Ohio App.3d 112, 119, 694 N.E.2d 538, 543.
* * *
 In State v. Ferguson (1983), 5 Ohio St.3d 160, 164, 450 N.E.2d 265, 268, an attempt to introduce evidence of a victim's sexual activity, if it is offered simply to impeach the victim's credibility, was prohibited.
 Moreover, a decision to apply the rape shield law is within the discretion of the judge.
 State v. Hart (1996), 112 Ohio App.3d 327, 331, 678 N.E.2d 952, 954. See, also, State v. Davis, 1990 Ohio App. LEXIS 3445 (Aug. 16, 1990), Cuyahoga App. No. 57404, unreported.
An abuse of discretion is more than an error of law or judgment, it connotes that the court's attitude is unreasonable, arbitrary or unconscionable. State v. Montgomery (1991), 61 Ohio St.3d 410, 413.
In the case sub judice, the defendant's alternative theory of the cause of Candice's psychic injuries stemming from her alleged sexual relationship, or plans to have or influence a sexual relationship, with Robert Austin, and the provision of birth control pills at Planned Parenthood, are clearly prohibited under the rape shield law because this contested evidence does not involve the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender. R.C.2907.02(D). The only conceivable purpose for the admission of this evidence is to permit the offender to impeach the credibility of the victim only, and not the credibility of another witness, to prove that Candice was lying; which purpose is not permitted pursuant to State v. Ferguson, supra. See In re Michael (1997), 119 Ohio App.3d 112 (evidence of the victim's prior sexual abuse by one other than the accused was not admitted to impeach the victim, but was admitted to prove that the victim had gained his knowledge of sexual activity by someone other than the offender); State v. Ungerer (Jun. 5, 1999), Ashland App. No. 95COA1125, unreported (evidence of prior abuse of the victim not admitted to impeach the victim's credibility, but was admitted to impeach the credibility of other witnesses who inculpated the offender based on observing the behavior of the victim); and, State v. Fussell (May 20, 1999), Cuyahoga App. No. 73713, unreported (offender could question a witness who was not the victim concerning prior sexual assaults of the victim by her step-father, which evidence was admitted to impeach the credibility of the victim's mother and not the victim).
Accordingly, this sub-argument is without merit.
The second sub-argument provides:
 B. Exclusion of Testimony Concerning a Sexual Relationship Initiated by Candice, In the Midst of the Two-Month Period of the Alleged Offenses Charged in the Indictment Violated Appellant's Right to Compulsory Process Protected by Article I, Section 10
of the Ohio Constitution and the Sixth Amendment to the Constitution of the United States.
In this sub-argument, appellant argues that excluding evidence of a sexual relationship between Candice and Robert Austin violated appellant's right to compulsory process.
This contested evidence was properly ruled as inadmissible under the rape shield law. See assignment of error I, sub-argument A, supra. As such, the right to compulsory process was not violated with regard to inadmissible evidence. See Taylor v. Illinois (1988), 484 U.S. 400,410-411; State v. Blankenship (1995), 102 Ohio App.3d 534. Appellant was perfectly free to call Master Austin to testify as to material which would not violate the rape shield law, but chose not to do so.
Accordingly, this sub-argument is without merit.
Sub-argument C provides:
 C. The Trial Court Erred In Denying Requests For Production of The Grand Jury Testimony of the Prosecutrix.
In this sub-argument, appellant argues that the trial court should have provided him the Grand Jury testimony of the victim, Candice.
In order to obtain Grand Jury testimony, the ends of justice must require it and a movant must demonstrate a particularized need for the testimony which outweighs the need for secrecy. See State v. Greer (1981), 66 Ohio St.2d 139, paragraph two of the syllabus. In the case sub judice, the particularized need offered by the defense for disclosing the testimony was simply that the prosecution had insisted that Candice's prior statements were consistent with her trial testimony and the defense needed this secret testimony to confirm the prosecution's beliefs concerning the consistency of Candice's trial and Grand Jury testimony. See appellant's brief at 15. The defense, who had vigorously cross-examined Candice at trial regarding the dates and times of the offenses, sought to reveal inconsistencies in Candice's testimony and was fishing for the more precise times for the offenses in issue, both of which would have arguably aided the defense case.
This pure speculation by the defense as to what the victim's Grand Jury testimony might contain is not a sufficient demonstration of a particularized need for that testimony and the trial court did not abuse its discretion in not disclosing such testimony. See State v. Webb (1994), 70 Ohio St.3d 325, 337.
Accordingly, this sub-argument is without merit.
Sub-argument D provides:
 D. After the Prosecution Was Improperly Permitted to Bolster the Testimony of its Principal Witness With False and Inadmissible Hearsay, and to Prevent Improper Argument Regarding the False and Inadmissible Hearsay, the Trial Court Erroneously Denied a Motion for New Trial Upon Proof That the Hearsay was False and the Prosecutors Knew it was False When it was Offered and Argued.
In this sub-argument, appellant argues that the State presented the testimony of the victim which was hearsay, and was known to be false hearsay at the time it was offered. The contested evidence concerns Candice's testimony regarding being dropped off at Dan Barnes'[9] house by the appellant during daylight hours, with Barnes waiting outside in the front of the house when appellant drove up with the victim, and that she testified, over defense objection, that Barnes knew that appellant was the person who had dropped her off. See Tr. 1077. Specifically, Candice's direct examination testimony is as follows relating to this issue:
Q. And who was the friend's house that you drove to?
A. Dan Barnes.
 Q. And did Dan Barnes know that Coach Kellon or Jeff Kellon took you to that house that night?
MR. MESSERMAN: Objection.
A. Yes.
THE COURT: She can answer that.
A. Yes. (Tr. 1077.)
Appellant later denied that he had ever driven the victim to, or picked her up at, Barnes' house. Tr. 1814. Appellant argues that Candice's testimony as to what Barnes knew was inadmissible hearsay at trial pursuant to Evid.R. 801(D)(1)(b).[10] The problem with appellant's argument is that Candice's testimony is not a statement as that term is defined by Evid.R. 801(A), which defines statement as (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by him as an assertion. Instead, Candice's testimony is merely her opinion, based on the fact that Barnes (a track team member who was undoubtedly familiar with Coach Kellon) was waiting outside during daylight hours when the appellant and victim drove up to his house, that Barnes must have been aware that it was the appellant who had driven Candice to Barnes' house. There was simply no assertion ascribed to Barnes, in either oral, written, or non-verbal conduct form.
Appellant also argues that the prosecution knew that the testimony at trial by Candice on this issue was false because, a year-and-a-half after the purported event, Barnes had averred in an affidavit given to a police detective, a copy of which is attached to the defense post-trial motion for a mistrial, that if he had seen the dropping-off event, that he would have recalled the event. Appellant then argues that because the Barnes' information to the police was exculpatory information, the prosecution violated their obligation to disclose it under Crim.R. 16(B)(1)(f) or Brady v. Maryland (1963), 373 U.S. 83. As concluded by the trial court in its ruling on this post-trial motion finding that the Barnes affidavit was not exculpatory information subject to disclosure, this averment by Barnes, that he could not recall for the detective that Kellon had driven Candice to his house, is not a direct contradiction of Candice's trial testimony and would not necessarily lead a jury to discount the portions of her testimony that describe the specific criminal acts of the defendant or where or when they occurred. We agree.
This sub-argument is without merit.
The first assignment of error is overruled.
The second assignment of error provides:
 II IN A TRIAL IN WHICH THE CHARGES AGAINST APPELLANT WERE SUPPORTED BY A SINGLE STATE WITNESS AND IN WHICH APPELLANT, HIS WIFE AND OTHER MEMBERS OF HIS FAMILY TESTIFIED AND PLACED THEIR CREDIBILITY IN ISSUE IN DENYING THE CHARGES, APPELLANT WAS DENIED A FAIR TRIAL BY THE PROSECUTORS' DELIBERATE FAILURE TO GIVE FAIR NOTICE OF THE CHARGES, THE PROSECUTORS' INTENTIONAL APPEAL TO RACIAL BIASES, THE PROSECUTORS' IMPERMISSIBLE AND UNFOUNDED ATTACKS UPON THE CHARACTER AND SEXUAL ACTIVITIES OF APPELLANT AND HIS WIFE, AND THE PROSECUTORS' ATTACKS UPON APPELLANT'S USE OF COUNSEL.
In arguing this assignment, appellant again utilizes a series of four sub-arguments. We will again address each sub-argument separately.
The first sub-argument provides:
 A. By Intentionally and Deliberately Failing to Provide a Timely Bill of Particulars, Misrepresenting to the Court the Information that was Available Concerning Times and Dates of the Alleged Offenses, Failing to Comply with Court Orders, Ignoring the Command of the Ohio Supreme Court in State v. Sellards, Falsely Suggesting to the Jury that the Defense had been Fully Informed of the Times and Dates of the Alleged Offenses in a Timely Fashion, and Challenging the Memories of the Defendant and Defense Witnesses with Respect to Activities on the Dates of the Alleged Offenses, the State Deprived Appellant of Rights Protected by Art. I, S10 of the Ohio Constitution, and by the Sixth and Fourteenth Amendments to the Constitution of the United States.
The essential argument in this multi-faceted sub-argument is that appellant was denied a fair trial because the State did not provide a timely bill of particulars, which materially prejudiced appellant from defending himself against the charges, and the trial court should have granted the appellant's motion for a mistrial based on this alleged flaw.
This court stated the following with respect to the provision of a bill of particulars:
 R.C. 2941.07 mandates that upon request for a bill of particulars, the prosecution shall furnish a bill of particulars setting up specifically the nature of the offense charged and the conduct of the defendant which is alleged to constitute the offense. Details concerning specific dates and times are not generally required in the bill of particulars as they are not usually related to the conduct involved. State v. Sellards (1985), 17 Ohio St.3d 169, 171; State v. Gingell (1982), 7 Ohio App.3d 364, 367. If the state possesses such temporal information, however, it must, in response to a motion for a bill of particulars, furnish the accused with specific dates and times. Sellards, supra; Gingell, supra at 367.
State v. Carte (Jan. 14, 1999), Cuyahoga App. No. 72955, unreported, 1999 WL 13962 at 6.
The trial court reviewed this same argument presented by the appellant and, while it concluded that the State had knowledge of the dates and times and should have provided this information to the defense, it determined there was no prejudice to the appellant in the preparation of his defense, stating:
 On July 19, 1999, the defense moved for a bill of particulars requesting, among other things, the specific dates upon which the alleged conduct occurred. The prosecutors responded on August 12, 1999 with the same information as in the indictment July 6, later in July, early August, and during late August.
 On November 23, 1999, the Court granted defendant's request for a supplemental bill of particulars, requiring the prosecutors to give sufficient information as to the time of day, occasion for the parties being together, and lapse of time between occasions . . . so that [defendant] can distinguish the events and prepare a possible alibi. On January 21, 2000 five days before trial the prosecutors responded by stating that the events later in July and early August occurred between 8:30 and 11:00 p.m. and that the late August incident was on a Thursday morning.
 Evidence produced at trial demonstrated clearly that those details were either known to the prosecutors or easily secured for over six months prior to their disclosure.
 The prosecutors' delay in uncovering and disclosing that information in response to the motion for supplemental bill of particulars and the Court's order of November 23, 1999 was deliberate. The prosecutors' attempt to justify the failure to respond promptly to the November 23 order is not well founded.
 Granting of a motion for mistrial depends both upon misconduct by the prosecutors and substantial prejudice to the defendant. The prosecutors properly assert that defendant has not demonstrated prejudice for that misconduct since defendant did not seek a continuance of the trial nor, in fact, assert an alibi for the events in late July or August of 1998, and the information provided before November 23 as to the first incident in July was sufficiently precise.
See Court's March 21, 2000, order on defendant's motion for mistrial/dismissal, at 5-6 (a copy of which is attached to appellee's brief at attachment A). Also see State v. Lawrinson (1990),49 Ohio St.3d 238 (provided a two-part test to be applied by a trial court in analyzing the failure to provide specific dates and times in a bill of particulars, to-wit, [1] did the State possess the temporal information, and if it did, was [2] the temporal information material to the defendant's ability to present a defense).
As was the case in State v. Carte, supra, the trial court herein properly concluded under Sellards, and without referencing it, Lawrinson, that the defense was not prejudiced by the prosecution's failure to timely provide the temporal information in its possession. No alibi was presented for the second, third and fourth offenses. When confronted with the more precise dates and times, the defense made no motion to continue the trial so as to better tune his defense with further discovery. Also, the defense filed no notice of alibi. Furthermore, there was vigorous and lengthy examination of the principal witnesses (Candice and the Kellons) with regard to the specific dates and times of the offenses. In short, we agree with the trial court in finding that there was no material prejudice to the defense in the prosecutors' failure to disclose the temporal information in a more timely bill of particulars.
Finally, appellant argues that the prosecution invaded attorney-client privilege when the prosecution questioned Kellon, thusly:
 Q. Did you ever ask someone to go obtain it [the affidavit for search warrant] and explain the affidavit?
MR. MESSERMAN: Objection.
THE COURT: He can answer that question.
A. My attorney explained it to me.
Q. Mr. Messerman?
MR. MESSERMAN: Objection.
THE COURT: Objection is sustained.
 Q. How long ago I will ask you this: How long ago was the affidavit explained to you?
MR. MESSERMAN: Objection.
THE COURT: He can answer that question.
A. About a year.
 Q. Okay. Approximately in January of `98? `99. I'm sorry.
A. Maybe more like February. I don't recall.
 Q. So, in February of 1999, you knew that the events in question concerned the months of July and August of `98?
A. Yes. (Tr. 1821-1822.)
This line of questioning was proper and did not intrude on attorney-client privilege under R.C. 2317.02(A) because it did not ask what the defense attorney (Mr. Messerman) advised Kellon in relation to explaining the affidavit for search warrant.
This sub-argument is without merit.
The second sub-argument provides:
 B. Appellant Was Denied a Fair Trial by the Prosecution's Impermissible Appeal to Racial Biases During the Course of the Trial.
This sub-argument is divided into two areas, voir dire of the jury and the use of a peremptory challenge by the prosecution which excluded an African-American from the jury panel, and the prosecutor allegedly appealing to natural biases during the trial.
With respect to the voir dire, the record reflects that at the time of this peremptory challenge, the defense raised the authority of Batson v. Kentucky (1986), 476 U.S. 79, and sought a race-neutral explanation for the prosecution's second challenge. Tr. 621. The prosecution, noting that there remained three other African-Americans in the jury pool who were not challenged, responded with a race-neutral explanation: as to juror number 21, an African-American male, the juror was challenged because he had two reunions to attend and he stated that he did not want to be on the jury, and he was uncertain at that point whether the sexual misconduct between Kellon and the victim was immoral. The court, obviously concluding that the defense had not proved purposeful discrimination, excused juror 21. Tr. 624. We see no abuse of discretion by the trial court, or a Batson violation, with regard to the peremptory challenge of juror 21.
With regard to the purported appeal to natural biases, appellant points to two alleged examples. First, the appellant notes a question of him by the prosecutor concerning whether appellant had an interest in young girls because they were thought by appellant to be subservient, and whether appellant had ever told a co-worker that he liked white girls because he thought they were subservient. Tr. 1802. The trial court overruled objections to these two questions and the appellant ultimately denied making these statements or having such beliefs. Id. These questions, as found by the trial court in its ruling on the post-trial motion for new trial/mistrial, were relevant to appellant's credibility, to the victim's credibility with regard to her being subservient to appellant's overtures, and to showing a motivation for appellant's conduct.
The second example of an alleged appeal to natural bias concerns the rebuttal closing argument of the prosecution, in which the prosecutor, who was selected from outside Cuyahoga County (from Medina County) to prosecute this case by Stephanie Tubbs-Jones, made reference to that fact at the opening of his rebuttal argument:
 Thank you, your Honor. Ladies and gentlemen of the jury, at least you didn't try to run out of the room when you stood up a few seconds earlier.
 It's been a pleasure to appear before you here as your public servant. It's been a pleasure to serve you for the past week or so.
 When Stephanie Tubbs-Jones called for me to get involved in this case and told me what the subject of the case was about, I knew immediately this was not going to be a pleasant case, but because of a sense of duty to her and this county, we agreed to take this case. I agreed to take this.
MR. MESSERMAN: Objection, your Honor.
MR. HOLMAN: That's why I'm here.
THE COURT: It's all right. (Tr. 2125.)
According to appellant, this momentary reference to Stephanie Tubbs-Jones (an African-American woman who was the former Cuyahoga County Prosecutor at the time Kellon was indicted and who arranged for the appointment of a special prosecutor from outside the county to handle the case due to a potential conflict of interest with the Cuyahoga County prosecutor's office, caused by Kellon's brother being then an assistant Cuyahoga County prosecutor and Kellon being employed in the county probation department) was sufficient to cloak him with Ms. Tubbs-Jones alleged approval and popularity, and in company with the remaining language of the prosecutor (some of which was outside the record), enhance his credibility. Counsel during closing arguments are given wide latitude in their summations to the jury and we are required to view that summation in its totality when determining whether the allegedly improper remarks were prejudicial. State v. Treesh (2001), 90 Ohio St.3d 460,466. Any reasonable interpretation of these comments by the prosecutor in rebuttal closing, after viewing the summation as a whole, fails to demonstrate any prejudice to the defendant's case. Without knowing the political beliefs of the jurors, it is just as reasonable to conclude that Ms. Tubbs-Jones lacks approval and popularity, and that the prosecutor's decision to become involved with the case out of a sense of duty to her and the county was misguided and served to decrease the prosecutor's credibility with the jury.
This sub-argument is without merit.
The third sub-argument provides:
 C. In Violation of Rule 404(A) of the Ohio Rules of Evidence, and Over Repeated Objection, the Prosecution Was Permitted to Engage in Extensive Exploration of the Kellons' Sexual Preferences and Activities.
In this sub-argument, appellant argues that the trial court improperly admitted character evidence in violation of Evid.R. 404(A). The allegedly improper evidence consisted of questioning concerning Kellon's sexual proclivities, activities, and practices with females, and whether he had an open marriage, preferred certain types of clothing to be worn by his wife or used vibrators as a part of their sexual practices, and whether he had an extramarital affair.
In this case, appellant's original indictment included alleged violations of rape (R.C. 2907.02). The second paragraph of R.C.2907.02(D) provides:
 Evidence of specific instances of the defendant's sexual activity, opinion evidence of the defendant's sexual activity, and reputation evidence of the defendant's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, the defendant's past sexual activity with the victim, or is admissible against the defendant under section 2945.59 of the Revised Code, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value. (Italicization added.)
R.C. 2945.59, Proof of Defendant's Motive, provides:
 In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.
These types of other acts evidence brought forth by the prosecution are admissible under R.C. 2945.59, and its generally similar counterpart, Evid.R. 404(B), in order prove the identification of appellant as the perpetrator, as well as his motivation, scheme, plan, or system, in his doing the acts in question.
This sub-argument is without merit.
The fourth sub-argument provides:
 D. Impermissible and Unwarranted Attacks Upon Appellant's Principal Witness, His Wife, Were Permitted, Over Objection, in Violation of Rule 607(B) of the Ohio Rules of Evidence.
In this sub-argument, appellant argues that the trial court erred in preventing certain testimony by Kellon's wife on direct examination by the defense, and improperly permitted questioning of Kellon's wife on cross-examination and re-cross examination by the prosecution.
During direct examination of Kellon's wife, the defense had just elicited the fact that she had not always been a nurse, but had been an account planner for an advertising agency prior to becoming a nurse. Tr. 1410. The defense then asked the following questions:
 Q. And how did you go from being an account planner for an advertising agency to be a labor and delivery room nurse?
MR. HOLMAN: Objection. Irrelevant.
THE COURT: Objection is sustained.
Q. Can you tell us your educational background?
MR. HOLMAN: Objection.
THE COURT: Sustained.
 Q. How long have you been a labor and delivery nurse?
MR. HOLMAN: Objection, your Honor.
THE COURT: She can answer that.
 A. I graduated from Case in `95 and had been a nurse since then. So, for over four years.
Q. And you're now also a nurse midwife?
 A. Yes, I am. Well, I graduated from my school. I haven't found out the results from my boards yet. (Tr. 1410-1411.)
Appellant takes issue with the first two questions above which were not admitted by the trial court. As for the subject matter of the first question how she came to switch careers and become a nurse the reason for this switch in careers by Mrs. Kellon is irrelevant to the determination of the action. Evid.R. 401.
As for the subject matter of the second question Mrs. Kellon's educational background is likewise irrelevant to the determination of the action. Evid.R. 401. The fact that the defense then admitted into evidence that Mrs. Kellon had graduated from Case Western Reserve University and had also received a midwifery degree and was waiting for the results of her board certification only lessens any harm caused by the court not initially allowing such testimony. In the event there was error in precluding either of these two questions, such error, when viewed under the totality of the evidence, was harmless. Crim.R. 52(A).
Turning to the cross and re-cross examination of Mrs. Kellon, appellant argues that Mrs. Kellon was accused of being, in essence, a co-conspirator or facilitator for her husband's sexual activities with Candice in that: (1) Mrs. Kellon took Candice to Planned Parenthood without Candice's parents' consent or knowledge to obtain birth control pills (Tr. 1486, 1488, 1492); (2) that she was very busy, knew of the relationship between Candice and her husband, and took Candice to Planned Parenthood to encourage that relationship (Tr. 1492, 1522). Mrs. Kellon consistently denied these accusations. The prosecution also sought to admit a photograph of Julia Pankhurst into evidence over the objection of the defense. Finally, over the objection of the defense, the prosecution pursued a line of questioning with Mrs. Kellon which suggested that Kellon had no family photographs in his office at the probation department.
The defense motioned the trial court for a mistrial based on these accusations, and the trial court initially denied the motion for mistrial. However, after reconsidering the motion during an overnight recess of the proceedings, the trial court concluded that there was no reasonable factual basis for the line of questioning and instructed the jury to disregard the suggestion that Mrs. Kellon had taken Candice to Planned Parenthood in order to facilitate or otherwise procure a sexual relationship between Candice and her husband. Tr. 1751, 1773-1774. The court also instructed the jury to disregard any testimony concerning the offering of Julia Pankhurst's photograph into evidence.[11] Tr. 1772. The court also instructed the jury to disregard testimony relating to the lack of family photographs at Kellon's office in the probation department. Tr. 1772-1773.
A jury in this state is presumed to follow the instructions given it by a court of law. State v. Loza (1994), 71 Ohio St.3d 61, 79; State v. Ferguson (1983), 5 Ohio St.3d 160, 163. There is no evidence presented that suggests that the jury did not follow the trial court's curative instructions, which adequately remedied the claimed error associated with the introduction of the questioned evidence. In fact, considering that Kellon was acquitted on the more serious charges, it is fair to infer that the jury did not act in a rogue fashion and disregard the instructions given it.
This sub-argument is without merit.
The second assignment of error is overruled.
The third assignment of error provides:
 III THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTIONS FOR MISTRIAL, BOTH DURING AND AFTER TRIAL, ON THE BASIS OF PERVASIVE PROSECUTORIAL MISCONDUCT.
Appellant presents two sub-arguments in this assignment. Each will be discussed in turn.
The first sub-argument provides:
 A. The Prosecutors Falsely and Improperly Accused Appellant's Attorneys of Hiding the Truth.
In this sub-argument, appellant claims that the prosecutors attacked defense counsel by accusing defense counsel of disguising the truth, and generally impugning the credibility of defense counsel. Appellant's brief at 37-38. The specific instances alluded to by the appellant begin with the prosecution's cross-examination of Mrs. Kellon, when she was asked about Kellon changing his appearance in the Summer of 1999, by not shaving his head and letting his hair grow in. Tr. 1420-1421. Mrs. Kellon testified, over defense objection which was overruled, that when she and her husband discussed this change that she told him that she liked his new hair style. Tr. 1421. Next, the prosecutor continued this line of questioning on the cross-examination of Kellon, when he was asked about changing his appearance since the time of the offenses herein. Tr. 1595. Kellon admitted, over an unsuccessful defense objection, that he had let his hair on his head grow out. The prosecutor then immediately asked the following question, With all respect, was that at the advice of defense counsel? Over unsuccessful defense objection, Kellon answered no. Tr. 1595-1596.
Appellant next takes issue with the prosecutor's rebuttal closing argument in which the State argued that the vibrator seized from the Kellon home, State's Exhibit 2, was tested for DNA by the prosecution but was never tested by the defense for the presence of DNA:
 The DNA testing was done on the vibrator on the longshot this might show something. We anticipated it would not. And, ladies and gentlemen, I submit to you if we hadn't done this DNA on the vibrator, that's all you would have heard about in this case. And the defense could have this tested. They never asked for it to be tested.
MR. MESSERMAN: Objection.
THE COURT: He can argue that.
 MR. HOLMAN: The defense could have this tested and never requested it be tested. The State did. We wanted to give you all the facts, and we did. (Tr. 2154-2155.)
* * *
Rather than being an effort to impugn the integrity of defense counsel, we find these comments to be fair comment for the prosecution. In the case of Kellon changing his appearance following the offenses, such a fact is relevant to the credibility of Candice in her correctly identifying Kellon as the offender herein. In the case of the DNA commentary on rebuttal, the defense opened the door to comments concerning the scientific testing of the vibrator when, on cross-examination of Police Detective William Stross, the defense questioned the witness concerning the State's decision to wait over a year to initiate the DNA testing on the vibrator. The door was further opened by the defense when, during its closing argument, it made similar remarks concerning the State's delay in initiating the DNA testing of the vibrator and opined that the wait to begin testing was because the State believed, and wanted the jury to believe, that it was an open and shut case. Tr. 2098. With this sort of remark by the defense in closing, the State was well within its rights to offer on rebuttal an alternative, and equally plausible, reason for the delay of DNA testing by the State. We find no misconduct by the State in this testimony or summation.
This sub-argument is without merit.
The second sub-argument provides:
 B. The Prosecutor Engaged in Misconduct Before and During Trial.
In this final sub-argument, appellant argues five areas of alleged prosecutorial misconduct which prevented Kellon from receiving a fair trial:
 1. Intentionally and deliberately withholding information concerning the specific times and dates of the offenses charged;
 2. Falsely representing to the Court that the State had no such information;
 3. Failing to comply with the Court's order, issued in November of 1999. That order required that specific information concerning times, dates and places of the alleged offenses be disclosed. The prosecutors did not disclose that information until January 21, 2000 — five days before trial;
 4. The prosecutors repeatedly ignored rulings of the Trial Court. For example, the prosecutors continued to argue that Appellant did not have photographs of his family in his office after the opposite had been established at hearing outside of the presence of the jury;
 5. The prosecutors expressed their personal belief concerning the credibility of Candice, and Appellant's lack of credibility. In violation of applicable rules, of the evidence, and of the truth, the prosecutor argued that Candice's testimony has always been the same, consistent (TR 2144-45), despite the fact that an identical argument had been determined objectionable by the Court (TR 2081).
Appellant's brief at 39.
With regard to areas 1 through 4, inclusive, these matters have been discussed in earlier portions of this opinion and have been found to be without merit.
With regard to area 5, the following summation was conducted by the State during its closing argument, in which the prosecution commented on Candice's three hours of interrogation with Detective Schmitt and opined that she had been consistent with regard to the offenses during that questioning by the police:
 And her [Mrs. Kellon] testimony is — and consider the credibility of the witnesses.
That's really what this case is all about.
 Why would Candice lie? Why would the defendant do this? Who's more credible of a witness? In all the hours of Candice's testimony to Detective Schmitt, in excess of three hours, there aren't any inconsistencies as to what occurred.
MR. MESSERMAN: Objection.
 THE COURT: Objection sustained. Ladies and gentlemen, you will just have to go with what the evidence is that you have here. (Tr. 2081.)
* * *
The next passage referred to in area 5 came during rebuttal closing by the State, at which time the prosecutor details consistent facets in Candice's testimony concerning the offenses herein:
 * * *, if Candice wasn't repeating these incidents as accurately as she has, how could she place this one consistently as the time that Mr. Kellon drove her to Mr. Barnes' house? Dan Barnes' house, the kid? How could she keep saying it? Wouldn't she make a mistake? Well, it could have been the fourth time or he took me to Robert Austin's house or he took me back home. It's always been the same, consistent.
MR. MESSERMAN: Objection.
THE COURT: This is argument. (Tr. 2144-2145.)
* * *
Other than making the simple assertion that the prosecutor's conduct operated to deny Appellant a fair trial, * * *, appellant's brief at 40, appellant fails to explain or demonstrate what prejudice befell him as a result of the purported misconduct complained of in area 5. Without this demonstration of prejudice, we cannot conclude that appellant was denied a fair trial. State v. Apanovitch (1987), 33 Ohio St.3d 19, 24. In the alternative, this same argument was presented to the trial court in appellant's post-trial motion for mistrial/new trial, and the trial court overruled the motion, finding that in the context of the total summation that, rather than the prosecutor offering his personal opinion of the credibility of the witnesses, the prosecutor was referring to the jury's expected evaluation of the witnesses. . . See order of March 21, 2000, at 12. We agree.
This sub-argument is without merit.
The third assignment of error is overruled.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
MICHAEL J. CORRIGAN, J., and FRANK D. CELEBREZZE, JR., J., CONCUR.
[1] Appellant was originally indicted on the following counts: (1) one count of kidnapping (R.C. 2905.01); (2) one count of rape (R.C.2907.02); (3) four counts of sexual battery (R.C. 2907.03); (4) four counts of corruption of a minor (R.C. 2907.04); (5) three counts of gross sexual imposition (R.C. 2907.05); (6)possession of criminal tools (R.C.2923.24); and (7) possession of cocaine (R.C. 2925.11). The jury herein found Kellon guilty of the rape count, but the trial court granted judgment for Kellon notwithstanding the verdict on this count. The drug count was tried separately and Kellon was found not guilty. Except for the corruption of a minor and possession of criminal tools counts, Kellon was acquitted on the remaining counts either by the jury or by the trial court granting a motion for acquittal pursuant to Crim.R. 29.
[2] Kellon lived in Cleveland Heights, Ohio, approximately one block from the victim's home. Tr. 1022.
[3] Candice has, in addition to herself, three sisters and two brothers in her family. Tr. 1232.
[4] Candice also testified that she was five-feet-three-inches tall, weighed 124 pounds, and lived in Cleveland Heights, Ohio. Tr. 1014.
[5] In this personal journal entry, Candice stated that she did not enjoy the sexual conduct, per se, but engaged in the sexual misconduct because she liked the motorcycle ride and Kellon's attention. Tr. 1069-1070, 1073-1074. She even posed the following rhetorical question and answer, Ever do it again? Hell, yeah. Tr. 1070, 1074.
[6] According to Candice, the infant son was in his crib.
[7] Coach Holland generally corroborated Candice's testimony at trial.
[8] According to Candice, Austin lived several streets over from her home. Tr. 1029.
[9] Dan Barnes was also a student at Cleveland Heights High School and Candice's fellow track team member.
[10] Evid.R. 801(D)(1)(b) provides in pertinent part:
A statement is not hearsay if:
 (1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is * * * (b) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive, * * *.
[11] Miss Pankhurst was also a track team member at Cleveland Heights High School, a friend of Candice's, and who also babysat for the Kellons. Her photograph was found inside a book which was in Kellon's belongings at his office in the probation department. The prosecution offered it to show that Kellon had an attraction to young girls.